**ADOPTION OF SHERRY.**

Middlesex. September 10, 2001. - November 13, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Parent and Child,* Adoption, Dispensing with parent's consent to adoption, Care and protection of minor. *Adoption,* Care and protection, Dispensing with parent's consent, Foster parents. *Minor,* Adoption, Care and protection. *Evidence,* Expert opinion, Child custody proceeding. *Witness,* Expert. *Attorney at Law,* Work product.

In a proceeding to dispense with parental consent to adoption, a District Court judge erred in excluding from evidence, on the basis of work-product privilege, portions of an expert's report, and erred in admitting in evidence, under G. L. c. 119, § 29D, an unsworn, written statement by the foster mother; however, neither error affected the judge's findings, supported by the record, constituting the clear and convincing evidence required to dispense with the father's consent to the adoption of his child. [335-339]

PETITION filed in the juvenile session of the Waltham Division of the District Court Department on March 13, 1997.

The case was heard by *Paul C. Menton,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Michael F. Kilkelly* for the father.

*John E. Bowman, Jr.,* Assistant Attorney General (*Robert L. Quinan, Jr.,* Assistant Attorney General, with him) for Department of Social Services.

*David A.F. Lewis* for the child.

The following submitted briefs for amici curiae:

*Alexander G. Gray, Jr.,* for Chief Justice of the Juvenile Court Department & another.

*Alene Ross Levy, Mercy Lowe, & Elsa Itz,* of Texas, for Justice for Children.

*Andrew L. Cohen & R. Susan Dillard,* Committee for Public Counsel Services, for Committee for Public Counsel Services.

IRELAND, J. At the age of three years, Sherry[1] was adjudicated in need of care and protection, and a District Court judge dispensed with the need for Sherry's parents' consent to her adoption. Her father appealed,[2] claiming that the judge erred in (1) refusing to admit in evidence a certain expert's opinion; (2) accepting the unsworn, written statement of the foster mother under G. L. c. 119, § 29D; (3) finding that the father was unfit; and (4) admitting hearsay. We transferred the case to this court on our own motion.

Although we conclude that it was error to have refused to admit the expert witness's testimony and to have accepted the foster mother's written statement, such errors were not prejudicial, and we affirm.

1. *Facts.* We outline the pertinent facts, reserving some for discussion in conjunction with the issues raised.

a. *Domestic violence allegations and procedural history.* A social worker with the Department of Social Services (department) testified that the mother had reported in July of 1996 that the father had been abusive toward her, and in August of 1996 reported that he had hit her, been arrested for assault and battery, and was incarcerated. According to a department report, the police had responded to domestic violence calls from the home on ten occasions between September, 1996, and March, 1997.

On August 19, 1997, both parents were charged with assault and battery on each other, and the mother was charged with assault with a deadly weapon and malicious destruction of property over $250. The father testified that the mother had hit him in the face more than once, and that he had hit her, as well, making her bleed and leaving a bruise. The mother also testified that they used to hit each other. Nevertheless, both parents maintained that domestic violence was not a problem in their relationship.

The department filed a care and protection petition and was granted temporary custody of Sherry. It found her a foster home, and began working toward reunification of the family. The father

---

[1]A pseudonym.

[2]Sherry's mother is not a party to this appeal.

enjoyed weekly supervised visits with Sherry at his home, and received early intervention services from the department. He participated in parenting classes, and individual and couples counseling. He completed an anger management course, and attended forty-five of the forty-eight weeks of a domestic violence program. He was terminated from the program three weeks before it ended because although he acknowledged having been emotionally abusive, he denied having physically abused Sherry's mother. He cannot complete the treatment program without this admission.

In June of 1998, the department's goal for Sherry changed from family reunification to adoption, and the department initiated proceedings to dispense with parental consent.

b. *Psychological evaluations.* In response to the allegations of domestic violence and the department's goal change, the father went to Dr. George Thompson for an evaluation. Dr. Thompson performed numerous psychological tests and reported that the father's feelings of anger are situational rather than chronic, and that he copes with anger by withdrawal and other passive mechanisms. There were no indications of impulsivity, nor did the father register as particularly hostile. Dr. Thompson concluded that the father lacks the characteristics of a batterer, but believed that he probably would benefit from a short-term conflict resolution and anger management program.

Dr. Harry J. Somers also evaluated the father. He reported that the father demonstrates an unwavering commitment to care for Sherry, and that he is affectionate and appropriate with her. Dr. Somers's psychological testing led him to conclude that the father "is at risk for domestic violence in only isolated instances," and that he would profit from learning specific anger management techniques.

In December, 1998, on the department's referral, Dr. Fernando Mederos performed a clinical evaluation of the father's capacity to care for Sherry. Dr. Mederos reported that, although there is no indication that the father had been or would be violent with Sherry, she would be at risk of witnessing his physical abuse of another caretaker. Dr. Mederos recommended that the father not be given custody of Sherry unless he adhered

to a structured program of therapy and support from the department for two years.

c. *Special needs.* Sherry has many special medical needs, which require an unusual degree of care. For example, her head was misshapen at birth. She wore a helmet for the first year of her life to correct its uneven growth, and her head remains much smaller than an average child's. She is significantly speech delayed. When she was thirty-two months old, she had the speech range of only a fifteen to eighteen month old child. Her inability to communicate frustrates her, and she sometimes throws herself behind a chair, crouching and crying because she cannot make herself understood. She also has severe eczema, for which she has several prescription creams, takes a daily tar bath, and must avoid dyes and perfumes in all her soaps and laundry detergents. Finally, Sherry is violently lactose intolerant and soy intolerant. To address all of her special medical needs, she required three or four doctor's appointments a month at the time of trial.

The father testified that he had attended only three of Sherry's medical appointments because he had not been invited to attend more, or because they had been scheduled for times he had to work. If given custody, he said he would contact Sherry's doctors and learn whatever was necessary to care for her. He also said that he would arrange for child care during the workweek, and would try to schedule her medical appointments for times such as late afternoons, to minimize the amount of work he would have to miss.

d. *The trial judge's findings.* Trial took place from late September through late October of 1999.[3] The judge found that, although the father truly loves Sherry and sincerely believes that he is able to care for her, he does not appreciate the extent of her special needs.[4] He found that the father is a domestic

---

[3] We take this opportunity to reemphasize the importance of expediting child custody cases. Sherry was first removed from her parents' care as an infant, and she is now almost five years old. This process, from initial removal to final judgment, has taken far too long for Sherry's best interests.

[4] For example, during one visit the father fed Sherry hot dogs packed in skim milk, which caused her to vomit, even though the ingredients were marked on the package.

abuser, that his plan for caring for Sherry is unrealistic, and that to place her with him would not be in her best interests.

2. *Analysis.* The grant of a petition to dispense with parental consent to adoption requires that the judge find parental unfitness by clear and convincing evidence. See *Santosky* v. *Kramer,* 455 U.S. 745, 748 (1982). We review the trial judge's findings of fact with deference, recognizing his discretion to evaluate witnesses' credibility. See *Adoption of Don, ante* 158, 166-167 (2001). Absent a showing that the findings are clearly erroneous, they will not be disturbed. See *id.* at 165, and cases cited. The legal standard the judge applied to the facts is reviewed de novo. See *Kendall* v. *Selvaggio,* 413 Mass. 619, 621 (1992).

a. *Refusing to admit the expert's opinion.* In October 1997, Sherry's counsel retained psychologist Janet Gilmore to perform an evaluation of Sherry's needs. Dr. Gilmore's evaluation included review of the case notes, interviews with the parents, the foster mother, the department caseworker, and others, as well as her observations of the child during visits with her mother and father.

With Sherry's counsel's permission, the father's attorney spoke with Dr. Gilmore in July, 1998. Sherry's attorney also gave Dr. Gilmore permission to speak to the court investigator to "provide background information about this matter," and to the father's successor counsel as "a courtesy" after the father's first attorney withdrew from the case. There is no indication in the record that Sherry's attorney had instructed either Dr. Gilmore or the father's two attorneys to limit the topics of discussion. Neither is there any evidence that she specified what was meant by the "background" Dr. Gilmore was to share with the investigator. Finally, there is no indication in the record that Sherry's lawyer attended any of these meetings or participated in any way in the conversations between her expert and the father's counsel, or those between her expert and the court investigator.

The investigator filed a report with the court that included Dr. Gilmore's opinions and recommendations, but the judge struck those portions of the report on the basis of work-product privilege. See Mass. R. Civ. P. 26 (b) (4) (B), 365 Mass. 772 (1974); *Hickman* v. *Taylor,* 329 U.S. 495, 511 (1947).

Dr. Gilmore had not prepared a written report, and Sherry's counsel informed the judge that she would not call Dr. Gilmore at trial. The father's counsel moved for leave to call Dr. Gilmore himself, but the judge denied that motion, too, on work-product grounds.

Voluntary disclosure on the part of Sherry's attorney, of course, would indicate that she had waived any work-product privilege. See *United States* v. *Massachusetts Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997). Assuming, arguendo, that Sherry's attorney did not voluntarily disclose Dr. Gilmore's opinions to the father's counsel and to the court, then the disclosure was inadvertent. Inadvertent disclosure cases turn on whether reasonable precautions were taken to prevent disclosure. See *Matter of the Reorganization of Elec. Mut. Liab. Ins. Co.*, 425 Mass. 419, 422-423 (1997), and authorities cited. It is clear from the record that no such precautions were taken here. Sherry's attorney gave Dr. Gilmore permission to speak to the court investigator and two different attorneys for the father, gave no limiting instructions to anyone, and was not present for these conversations. Any privilege that existed was waived by such conduct. Therefore, it was error to have excluded this information.

Nevertheless, we need not disturb a judgment when error did not affect the outcome. See G. L. c. 231, § 119; *Care & Protection of Frank*, 409 Mass. 492, 499 (1991). The judge's decision hinged on his finding that the father was a batterer who had not made sufficient effort to address his problem, and that he was unable to accommodate Sherry's special needs. Dr. Gilmore's opinion, as represented in the court investigator's unredacted report, would not have altered either of these key findings.

As to the domestic violence, Dr. Gilmore felt that the department should have asked other women with whom the father had relationships whether he had been abusive. Because the mother of the father's older daughter had said that the father was not abusive, for example, Dr. Gilmore believed that Sherry's mother might have made up the accusations about the father's abuse.

Admission of this information would not have changed the outcome, however. The judge found that "[t]here is no question that there was physical and psychological abuse. Both parents

in effect have admitted this." Dr. Gilmore's opinion that the department should have checked the allegations more thoroughly through other sources did not contradict the parents' admissions made under oath before the judge that there had been violence in their relationship. Their testimony clearly was decisive for the judge, and his finding on the domestic violence issue would have been unaffected by admission of Dr. Gilmore's opinion.

Dr. Gilmore had nothing to contribute regarding the father's ability to care for Sherry's special needs but her belief that the father had not been given a fair opportunity to demonstrate his capacity. The judge's findings indicate close attention to the interest the father had demonstrated in his daughter's medical care, and his behavior in caring for her needs during visitation. The judge was aware of the limited interaction the father was permitted to have with Sherry. Admission of Dr. Gilmore's opinion that the father's interaction had been too limited to allow him to demonstrate his ability would not have altered the judge's own assessment on the evidence before him.

b. *Foster parents' rights.* The second error the father claims involves a statutory interpretation question of first impression. General Laws c. 119, § 29D, reads as follows:

> "The department shall provide notice of hearings [on custody changes or the severing of parental rights] to a foster parent, pre-adoptive parent or relative providing care for the child who is the subject of the petition and shall inform the foster parent, pre-adoptive parent or relative of his right to attend the hearing and to be heard. Nothing in this provision shall be construed to provide that such foster parent, pre-adoptive parent or relative shall be made a party to the proceeding."[5]

The foster mother testified at trial like any other witness, under oath and subject to cross-examination. However, she also proffered an unsworn, written statement. Over the father's objection, the judge accepted this statement, citing G. L. c. 119, § 29D, as justification. In so doing, the judge clearly stated that the statement was not being admitted in evidence, and noted

---

[5]This language tracks the requirements of the Adoption and Safe Families Act of 1997, 42 U.S.C. § 675(5)(G) (Supp. IV 1998), which offers Federal funding to States in compliance.

"Document — not an exhibit" at the top of the page. The father contends that this was error. We agree.

Because foster parents often possess the most detailed and the most current information available, the Legislature had good reason to permit them to be heard. The best interests of the child are served by ensuring that judges have all the relevant information about the child at their disposal before making such important decisions. The question before us is whether this statutory right to be heard includes the right to submit information for judges' consideration unconstrained by the usual evidentiary rules (i.e., relevance, personal knowledge, oath or affirmation, and cross-examination). We hold that it does not.

The rules of evidence have long been understood to govern the way in which one is heard in court. See *Powell* v. *Alabama*, 287 U.S. 45, 68-69 (1932). The rules of evidence stand guard to ensure that only relevant, reliable, noninflammatory considerations may shape fact finding. Without these rules, there would be nothing to prevent trials from being resolved on whim, personal affections, or prejudice. We do not imagine that the Legislature intended to remove these safeguards in such important determinations without specifically indicating such an intention. The only change effected by G. L. c. 119, § 29D, is that foster and preadoptive parents have an independent right to provide judges with evidence, and need not suffer in silence if the parties choose not to call them.[6]

Here, however, the foster mother did testify under oath, and was subject to cross-examination. Nothing in her written statement, apart from her actual testimony, appears to have played any role in the judge's findings. In the circumstances, allowing the foster mother to submit such a statement was not prejudicial error.

c. *Other contentions.* The father advances two final claims, both of which lack merit. First, he argues that the trial judge clearly erred in finding him unfit. We disagree. The trial judge

---

[6]We leave it for the trial court to determine the best procedure for the exercise of this right, recognizing the difficulties posed by witnesses testifying in the absence of questioning by counsel on direct examination. See Mass. R. Dom. Rel. P. 83 (West 2001) (granting authority to trial court to make supplemental rules governing procedure).

properly considered the statutory factors bearing on fitness, see G. L. c. 210, § 3 (c), and the findings contain sufficient detail to demonstrate his close attention to the evidence, see *Adoption of Helen*, 429 Mass. 856, 859 (1999). The judge's findings were supported by the record and, taken together, constituted the clear and convincing evidence required to dispense with parental consent to adoption. See *Adoption of Don, ante* 158, 167 (2001). Second, the father claims the judge erroneously admitted two hearsay statements into evidence. No legal support or reference appears in this part of the father's brief, however, and it does not rise to the level of appellate argument. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

3. *Conclusion.* Although the judge erred in excluding Dr. Gilmore's opinion and accepting the foster mother's written statement, these errors were harmless, and the remaining claims lack merit.

The adjudication that Sherry was in need of care and protection is affirmed. The decree terminating parental rights to consent to adoption is affirmed.

*So ordered.*