KATHLEEN A. ECCLESTON *vs.* PAUL E. BANKOSKY.

Barnstable. September 6, 2002. - January 13, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Divorce and Separation,* Modification of judgment, Postminority support to
   third party. *Jurisdiction,* Equitable.

This court concluded that a Probate Court judge lacked authority under either
   G. L. c. 208, § 28, the divorce modification statute, or G. L. c. 201, § 40,
   allowing a support award to a guardian, to order a divorced father to pay
   support after a child's eighteenth birthday to a third party appointed as his
   child's guardian and with whom his child was domiciled. [433-434]
This court concluded that a Probate Court judge had the authority pursuant to
   equity powers vested by the Legislature under G. L. c. 215, § 6, to impose
   a postminority support order on a child's financially able noncustodial par-
   ent or parents, insofar as the child was found not to be emancipated.
   [434-439] COWIN, J., dissenting.

COMPLAINT for divorce filed in the Barnstable Division of the
Probate and Family Court Department on August 10, 1987.

A counterclaim for modification, filed on April 17, 2001, and
a motion to dismiss, filed on July 20, 2001, were heard by
*Robert E. Terry,* J., and motions for reconsideration and for a
new trial were heard by him.

The Supreme Judicial Court granted an application for direct
appellate review.

*Lois M. Farmer* for the defendant.

*Kathleen A. Eccleston,* pro se.

MARSHALL, C.J. We consider in this case the novel question
whether G. L. c. 208, § 28,[1] authorizes a Probate and Family

---

[1]General Laws c. 208, § 28, provides, in pertinent part:

   "Upon a complaint after a divorce, filed by either parent or by a next
   friend on behalf of the children after notice to both parents, the court
   may make a judgment modifying its earlier judgment as to the care and
   custody of the minor children of the parties provided that the court
   finds that a material and substantial change in the circumstances of the

Court judge to order a divorced father to pay postminority support (support payable after a child's eighteenth birthday) to a third party appointed as his child's guardian and with whom his child is domiciled. It does not. A Probate and Family Court judge, however, does have authority pursuant to equity powers vested by the Legislature under G. L. c. 215, § 6, to determine whether the father should be required to support his daughter financially beyond her eighteenth birthday.[2] We vacate the modification judgment and remand this case for entry of a support order under G. L. c. 215, § 6, consistent with this opinion.

1. *Background.* We summarize the relevant factual and procedural history from the judge's memoranda and orders and from the undisputed facts. Cailyn Bankosky (Cailyn), born on May 13, 1983, is the only child of the marriage of Paul Bankosky (father) and Kathryn Mulroy (mother). Pursuant to their divorce in 1990, the mother was awarded physical custody of Cailyn and the father was ordered to pay child support in the

---

parties has occurred and the judgment of modification is necessary in the best interests of the children. . . . The court may make appropriate orders of maintenance, support and education of any child who has attained age eighteen but who has not attained age twenty-one and who is domiciled in the home of a parent, and is principally dependent upon said parent for maintenance. The court may make appropriate orders of maintenance, support and education for any child who has attained age twenty-one but who has not attained age twenty-three, if such child is domiciled in the home of a parent, and is principally dependent upon said parent for maintenance due to the enrollment of such child in an educational program, excluding educational costs beyond an undergraduate degree."

[2]General Laws c. 215, § 6, provides, in pertinent part:

"The probate and family court department shall have original and concurrent jurisdiction with the supreme judicial court and the superior court department of all cases and matters of equity cognizable under the general principles of equity jurisprudence and, with reference thereto, shall be courts of general equity jurisdiction. . . . Probate courts shall also have jurisdiction concurrent with the supreme judicial and superior courts, of all cases and matters in which equitable relief is sought relative to . . . (vi) all matters relative to guardianship or conservatorship . . . and of all other matters of which they now have or may hereafter be given jurisdiction."

amount of $171.31 each week. When Cailyn was eleven years of age, she was placed in the custody of the Department of Social Services (department) as a result of her parents' unfitness to care for her, specifically, the mother's alcohol abuse and the father's "inappropriate touch[ing]" of her. See G. L. c. 119, § 23. The department first placed Cailyn in a foster home and then with maternal relatives, but by December, 1995, it had returned Cailyn to her mother's home. On March 13, 1997, the department petitioned to restore custody of Cailyn, then thirteen years old, to the mother, and a Probate and Family Court judge granted the petition.

But Cailyn's situation remained precarious. In December of that year, the plaintiff, Kathleen Eccleston, on behalf of herself and her husband, Joseph Bell, successfully moved for immediate appointment of temporary guardianship of Cailyn on the ground that the mother's behavior put Cailyn at risk for neglect.[3] See G. L. c. 201, § 14. In March, 1998, over the mother's objection, a judge made the guardianship permanent.[4] See G. L. c. 201, § 2. The judge transferred the father's child support obligation, which had previously been reduced to $75 each week, from the mother to the guardian and further ordered the mother to pay $50 each month in child support to the guardian.[5] The judge also prohibited the mother and the father from contacting Cailyn. Several months later, Cailyn's guardian filed a pro se complaint against the father for modification, seeking an upward adjustment of child support consistent with the child support guidelines. A modification judgment dated January 8,

---

[3]The record on appeal does not disclose the nature of the guardian's relationship with Cailyn, although the guardianship petition describes Eccleston and her husband as Cailyn's "former foster parents." At oral argument, Eccleston represented that she and her family have had a "significant" relationship with Cailyn since the child was ten months of age, and that the guardianship represented the second time that Cailyn resided with them.

[4]The order appointing Eccleston and her husband permanent guardians was not docketed in the guardianship action or in the action for divorce between Cailyn's mother and father.

[5]Guardianship does not sever the parental-child relationship, nor the support obligation of a legal parent to a child. See, e.g., *Freeman* v. *Chaplic*, 388 Mass. 398, 403 (1983) (appointment of guardian does not, without more, extinguish parental custody rights); G. L. c. 201, § 40 (judge may award child support to guardian).

1999, ordered the father to pay $125 each week to the guardian in child support, payable by wage assignment through the department of revenue, pursuant to G. L. c. 208, § 28, the first reference to that statute.[6] The judgment did not specify a date for termination of support.[7] The father did not appeal.

In April, 2001, approximately one month prior to Cailyn's eighteenth birthday, her guardian filed a second pro se modification complaint requesting continuation of the existing child support order beyond Cailyn's eighteenth birthday.[8] In his answer and his motion to dismiss, the father argued that, once Cailyn reached her eighteenth birthday, the guardianship ended as a matter of law,[9] Eccleston lacked standing to pursue the modification complaint, and the judge lacked jurisdiction under G. L. c. 208, § 28, to order postminority child support because Cailyn did not "reside with a parent." The father also sought leave to counterclaim for termination of his support obligation as of the date Cailyn graduated from high school (about one month after her eighteenth birthday) and for a "credit" toward arrearages for any child support paid to the guardian after Cailyn's high school graduation.

The case proceeded expeditiously. On July 20, 2001, following a brief trial, the judge issued an order and memorandum

[6]Although in her complaint for modification Eccleston requested relief in her pending guardianship case, the court docketed and considered her request for relief under both the guardianship and the divorce proceedings between the mother and the father, and docketed the judgment on the divorce docket only. The judge should have considered Eccleston's request for relief solely under G. L. c. 201, § 40, which specifically permits a judge to revise an award of child support payable to a guardian.

[7]The January 8, 1999, modification judgment and other material filings were not included in the appellate record, as required by Mass. R. A. P. 8 (a), as amended, 378 Mass. 932 (1979).

[8]The second complaint for modification sought to modify the judgment entered pursuant to G. L. c. 208, § 28, see note 6, *supra*, and alleged that Cailyn would still be in high school when she turned eighteen years of age and would begin college in the fall of 2001. She had been awarded a four-year partial scholarship to the college of her choice in North Carolina. However, scholarships, loans, and grants, including a work-study grant, were insufficient to meet her anticipated needs. See note 10, *infra*.

[9]See G. L. c. 201, § 4, which provides: "The guardian of a minor unless sooner discharged according to law shall continue in office until the minor attains the age of eighteen years and shall have the care and management of all his estate."

granting the guardian's modification complaint. He also allowed the father's motion to file a counterclaim, but denied the father's motion to dismiss and his counterclaim. The judge reasoned that the guardian had standing to pursue the modification complaint on Cailyn's behalf because the complaint, filed prior to Cailyn's eighteenth birthday, "tolled" the operation of G. L. c. 201, § 4. Alternatively, he concluded, the guardian could proceed with the case as Cailyn's "next friend." See note 1, *supra*. The judge ruled that the guardian had proved a "material and substantial change in circumstances" and that modification would be in Cailyn's best interests, see *id.*, by showing that, without her father's continued financial assistance, Cailyn, an unemancipated child, would experience a "deficit in support" that would have a "negative[] impact[]" on her welfare.[10] Finally, the judge held that the guardian was entitled to child support as Cailyn's "de facto parent," see *Youmans* v. *Ramos*, 429 Mass. 774, 776 & n.3 (1999), and ordered the father to continue to pay $125 a week in child support to Cailyn's guardian.

The father filed two posttrial motions, one for reconsideration and the other for a new trial on the ground, inter alia, of allegedly newly discovered evidence that Cailyn was no longer living with the guardian.[11] After a hearing on the matter, the judge denied both motions in an order and memorandum dated September 14, 2001. The father appeals from the judge's decisions granting the guardian's requested relief and denying his

---

[10]The memorandum and order does not state any specific amount of "deficit." At trial, both the guardian and Cailyn presented uncontradicted testimony that Cailyn's scholarships and grants, including work-study grants, would leave her approximately $1,100 shy of meeting her freshman-year expenses for tuition and room and board only. No testimony was presented as to the cost of other educational expenses, such as books, or other costs, such as travel home or daily living expenses at college or when residing at home with Eccleston.

[11]The father claimed that Cailyn had moved out of her guardian's home around the time of the trial on the modification action. After a hearing on September 14, 2001, at which the father was represented by counsel and the judge heard testimony from the guardian, he determined that Cailyn had continued to reside with the guardian except for a brief visit to Vermont in late June, or early July, 2001, and that Cailyn was a full-time college student entitled to ongoing child support from the father pursuant to G. L. c. 208, § 28.

motions to dismiss, for reconsideration, and for a new trial. We granted the father's application for direct appellate review.

2. *Modification.* On appeal, the father does not contest the judge's conclusions that Cailyn's welfare will suffer without his continued financial support and that his continued support would be in Cailyn's best interests. Nor does he seriously contest that he has the ability to pay continued support in the amount of $125 a week.[12] Rather, the essence of the father's argument is that, because the guardianship was statutorily terminated when Cailyn became eighteen years of age, and because she did not reside with either of her parents as required by the postminority support provisions of G. L. c. 208, § 28, see note 1, *supra,* she was an "adult child" over whom the Probate and Family Court lacked further jurisdiction.

We agree that the judge erred in ordering the father to pay postminority child support to Eccleston pursuant to G. L. c. 208, § 28, the divorce modification statute. Eccleston is not Cailyn's "parent," and Cailyn therefore does not meet the statutory prerequisite that she be "domiciled in the home of a parent."

Nor could such an award be predicated on G. L. c. 201, § 40, which allows a support award to a guardian. The Legislature has specified that guardianship of a minor must end when "the minor attains the age of eighteen years." See note 9, *supra.* The statutory reference to an actual age precludes judicial discretion. See *Leibovich* v. *Antonellis,* 410 Mass. 568, 576 (1991) (no question of statutory construction where Legislature's intentions expressly stated).

Nor may this statutory end date be extended, or "tolled," as the judge held, by reference to general procedural rules regarding the commencement of actions, Mass. R. Civ. P. 3, as amended, 385 Mass. 1215 (1982), and Mass. R. Dom. Rel. P. 3 (2001) (same). See *Risk Mgt. Found. of the Harvard Med. Insts., Inc.* v. *Commissioner of Ins.,* 407 Mass. 498, 505 (1990) ("general statutory language must yield to that which is more specific"). Because her legal relationship with Cailyn ended as

---

[12]The father included one sentence in his "statement of the facts" on appeal that he cannot pay for Cailyn's college education, but he did not attempt to argue the point, thereby waiving it. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975); *Adoption of Sherry,* 435 Mass. 331, 339 (2001).

a matter of law on Cailyn's eighteenth birthday, Eccleston had no cognizable claim, as guardian, to receive support for Cailyn's care and maintenance, and, insofar as the judge ordered the father to pay postminority child support to her in that capacity, this was error.

3. *Postminority support.* However, the fact that the judge lacked authority under either G. L. c. 208, § 28, or G. L. c. 201, § 40, to order the father to pay postminority support to the former guardian for Cailyn's benefit does not, in our view, compel the conclusion that Cailyn was emancipated as a matter of law for all purposes when the guardianship ended on her eighteenth birthday, or that, as the dissent asserts, the father was then beyond the reach of the Probate and Family Court's jurisdiction in the matter of her continued support. The Legislature did not intend that emancipation "automatically occur on reaching the age of majority" in all circumstances. *Larson* v. *Larson*, 30 Mass. App. Ct. 418, 420 n.3 (1991), citing *Turner* v. *McCune*, 4 Mass. App. Ct. 864, 865 (1976).[13] To the contrary, since lowering the presumptive age of majority from twenty-one to eighteen, see St. 1973, c. 925 ("An act establishing the age of majority for certain legal purposes as eighteen years of age"),[14] the Legislature has acted repeatedly to clarify and reinforce its intent that a child's attaining eighteen years

---

[13]"Emancipation" is a legal term of art that relates to the cessation of rights and duties between parent and child. 1 D.T. Kramer, Legal Rights of Children § 15.01, at 665 (2d ed. 1994). "[I]t is concerned more with the extinguishment of parental rights and duties than with the removal of the disabilities of infancy." *Id. "Whether* an emancipation has occurred is a question of fact; it must be determined in the light of all relevant facts and circumstances surrounding each particular case. *What* constitutes emancipation, however, is a question of law." (Emphases in original.) *Id.* An individual may be considered emancipated for some purposes but not for others. See, e.g., *Hershkoff* v. *Registrars of Voters of Worcester*, 366 Mass. 570, 577-578 (1974) (college students may be "emancipated" to choose their domicil for voting purposes although they are dependent on their parents for support). See generally Scott, The Legal Construction of Adolescence, 29 Hofstra L. Rev. 547, 557 (2000) ("children cross over the line to legal adulthood at different ages for different purposes").

[14]Statute 1973, c. 925, followed the Twenty-sixth Amendment to the United States Constitution that lowered the voting age from twenty-one to eighteen years, and was passed in response to the conscription of men eighteen years of age to serve in the Vietnam War. Scott, The Legal Construction of Adolescence, 29 Hofstra L. Rev., *supra* at 563. Among the statutory provi-

does not, of itself, terminate the support obligations of a non-custodial parent. In 1975, for example, the Legislature amended G. L. c. 208, § 28, to grant Probate Court judges the authority to issue "orders of maintenance" for "any child who has attained age eighteen years but who has not attained the age of twenty-one years and who is living in the home of a parent, and is principally dependent upon said parent for maintenance." St. 1975, c. 661, § 1.[15] In 1976, the Legislature further expanded the jurisdiction of Probate Court judges to order postminority support under G. L. c. 208, § 28, by authorizing a judge to issue orders for payment of "support and education," as well as maintenance for children between eighteen and twenty-one years of age in specified circumstances. St. 1976, c. 279, § 1. In 1991, the Legislature once more enlarged the Probate and Family Court's authority over child support matters in divorce actions as to "any child who has attained age twenty-one but who has not attained age twenty-three" where the dependent child lives with the custodial parent and is pursuing an undergraduate degree. St. 1991, c. 173, § 1. See note 1, *supra.* "The Legislature apparently intended that children meeting the requirements set forth in [G. L. c. 208,] § 28 continue to be considered 'minors' at least for purposes of support." *Stolk* v. *Stolk*, 31 Mass. App. Ct. 903, 904-905 (1991).

The Legislature has not confined the opportunity for postminority support to children whose parents are divorced. In language identical to the postminority support provisions of G. L. c. 208, § 28, it has given Probate and Family Court judges authority to impose postminority support orders on noncustodial

---

sions inserted by St. 1975, c. 925, § 1, are: G. L. c. 4, § 7, Forty-eighth (defining "[m]inor" to mean "any person under eighteen years of age"); G. L. c. 4, § 7, Forty-ninth (defining "[f]ull age" to mean "eighteen years of age or older"); G. L. c. 4, § 7, Fiftieth (defining "[a]dult" to mean "any person who has attained the age of eighteen"); and G. L. c. 4, § 7, Fifty-first (defining "[a]ge of majority" to mean "eighteen years of age").

[15]In 1975, the Legislature also inserted G. L. c. 231, § 85P, made retroactively effective to January 1, 1974. St. 1975, c. 315. Section 85P expressly provides that any person domiciled in Massachusetts who is eighteen years of age is deemed "of full legal capacity" "[e]xcept as otherwise provided by law . . . ." St. 1975, c. 315, § 1. This provision requires courts to inquire whether specific provisions of other statutes override the presumptive age of full legal capacity established in § 85P.

parents where the parents have never married each other, or have legally separated. See G. L. c. 209C, § 9, as amended through St. 1995, c. 38, § 167, and St. 1996, c. 199 (paternity); and G. L. c. 209, § 37, as amended by St. 1975, c. 661, § 2; St. 1976, c. 279, § 2; and St. 1991, c. 173, § 2 (separate support). The Legislature has also enacted laws to ensure that children who have "aged out" of foster care on reaching the age of eighteen years receive postminority support to enable them to pursue opportunities for education, rehabilitation, and training. See G. L. c. 119, § 23 (Department of Social Services may retain responsibility for former foster child to age twenty-one years, with person's agreement, "for the purposes of specific educational or rehabilitative programs"). See also G. L. c. 152, § 31 (widowed spouse of deceased employee covered by workers' compensation benefits may receive additional payment for each child, including child over age of eighteen years who is "a full time student" and qualified dependent under Internal Revenue Code); G. L. c. 209D, § 1-101 (Uniform Interstate Family Support Act, defining "[c]hild" as "an individual, whether over or under the age of majority, who is or is alleged to be owed a duty of support by the individual's parent or who is or is alleged to be the beneficiary of a support order directed to the parent").

In enacting such statutes, the Commonwealth has recognized that merely attaining the age of eighteen years does not by itself endow young people with the ability to be self-sufficient in the adult world.[16] Statutes providing for postminority support advance the Legislature's purposes to maintain children "as

---

[16]Massachusetts is not unique in providing by statute that parents support their children beyond the age of majority in certain circumstances. See, e.g., Haw. Rev. Stat. § 580-47(a) (Supp. 2001); Mo. Ann. Stat. § 452.340.5 (Vernon 2002 Supp.); N.J. Stat. Ann. § 2A:34-23(a)(5) (West 2000); Wash. Rev. Code Ann. § 26.19.090 (West 1997). Contrast Cal. Family Code § 3901(a) (Deering 1994) (ending duty of support to unmarried child of divorced parents no later than first of child's attaining nineteen years of age or completing twelfth grade). We note as well that the American Law Institute's (ALI) Principles of the Law of Family Dissolution emphasize the role of child support statutes in ensuring that children's life opportunities are not truncated by the nonintact family, and in particular by the underinvestment of the parents in the child's higher education. See, e.g., ALI Principles of the Law of Family Dissolution: Analysis and Recommendations § 3.04 (2) & comment j, § 3.12(2)(a) & comment a, & § 3.24(2) (2002). See also John H. Chaffee

completely as possible" from parental resources, see G. L. c. 119A, § 1, to protect minor children of nonintact families from parental "underinvestment," see note 16, *supra,* and to encourage a skilled, educated workforce.

Yet there is a small category of children of nonintact families whose needs for postminority support the Legislature has not specifically addressed. It is the category to which Cailyn belongs: namely, children who, prior to turning eighteen years old, have become wards of the State because their parents are found unfit to care for them and who, after reaching eighteen years of age, continue to make their domicil with a custodial adult who voluntarily provides for them. As to such children, insofar as they are found to be "unemancipated" (that is, financially dependent), the equity powers granted to Probate and Family Court judges in G. L. c. 215, § 6, are broad enough to permit a judge to impose a postminority support order on the child's financially able noncustodial parent or parents.

In so holding, we act to close an unintended gap in the comprehensive legislative scheme providing postminority support to children of disrupted families that is consistent with the Legislature's directive to construe child support statues "liberally" to secure the welfare of children. G. L. c. 119A, § 1. Contrary to the dissent, we do not agree that an interpretation of the Probate Court's statutorily authorized equity jurisdiction that would disadvantage an especially vulnerable class of children is either required or proper under our laws. We have previously recognized that the general equity jurisdiction of the Probate and Family Court, conferred by statute, may be invoked to order a divorced, financially able noncustodial parent to contribute to the support of a mentally or physically incapacitated adult child. See *Feinberg* v. *Diamant,* 378 Mass. 131, 134-136 (1979). In conferring general equity jurisdiction on the Probate and Family Court, the Legislature intended to "assure that the interests of justice are served," *id.* at 137, in such

Foster Care Independence Program, 42 U.S.C. § 677(a)(6) (2002) (providing States with funding, inter alia, to "make available vouchers for education and training, including postsecondary training and education, to youths who have aged out of foster care").

circumstances as were present in *Feinberg* and that are present here. Rather than a "dangerous" act of superlegislation, as the dissent claims, *post* at 440, resort to equity is both explicitly authorized by the Legislature and appropriate as the narrowest ground on which relief can be afforded to Cailyn.

Moreover, the conclusion we reach today is neither forbidden by, nor contrary to, the provisions of any other statute. See *id.* at 137. The record demonstrates that Cailyn is a child who in every respect would qualify for postminority support from her noncustodial divorced parent pursuant to G. L. c. 208, § 28, had she a fit parent with whom she could "domicil" during her college years. But the neglectful, or worse, behavior of her mother and father has deprived Cailyn of any opportunity to establish domicil with either of them, not by her own choice but mandated by the Commonwealth for her own safety. It would be inimical to the Legislature's command that Massachusetts courts safeguard "the long-term well being of the child," G. L. c. 119, § 1, including "dependent" adult children to age twenty-three, to deny relief to a dependent child who is bereft of her parents' custody in the circumstances present here. See also G. L. c. 215, § 28 ("The supreme judicial court or appeals court may, upon appeal, reverse or affirm, in whole or in part, any judgment, decree or order of the probate court . . . or make any order therein as law and justice may require").

Eccleston, Cailyn's former guardian, has agreed to provide a domicil for Cailyn, although under no legal obligation to do so, and she has performed her caretaking role, as the judge found, in a manner both appropriate and supportive. Having determined that the Commonwealth, for Cailyn's own benefit, prevented Cailyn from maintaining a domicil with either of her parents, that Eccleston continues to provide a domicil for Cailyn, that Cailyn still needs financial support, that Cailyn's father is able to provide that support, and that Cailyn's domicil with Eccleston remains in her best interests, the judge properly could have ordered the father to pay postminority support to Eccleston for Cailyn's benefit under G. L. c. 215, § 6. He "simply should

not have done so as a corollary to the decree nisi of divorce."
*Feinberg* v. *Diamant*, 378 Mass. 131, 136 (1979).[17]

4. *Other motions.* The father's motions for dismissal,
reconsideration, and a new trial largely duplicate arguments we
have considered and rejected. To the extent that the father's
reconsideration and new trial motions raise factual questions
concerning Cailyn's domicil, we note only that, on appeal, the
father has addressed this argument peripherally at best, and we
therefore need not consider it. Mass. R. A. P. 16 (a) (4), as
amended, 367 Mass. 921 (1975). See *Adoption of Sherry*, 435
Mass. 331, 339 (2001). In any case, we find nothing in the rec-
ord that would lead us to disturb the judge's finding on the
question of Cailyn's domicil. *Bush* v. *Bush*, 402 Mass. 406, 411
(1988).

5. *Conclusion.* We affirm the judge's denial of the father's
motions for dismissal, reconsideration, and a new trial. We
vacate the support order entered pursuant to G. L. c. 208, § 28,
and remand this matter to the Probate and Family Court for
further proceedings in accordance with this opinion. On remand,
the modification complaint should be treated as a complaint by

---

[17]As noted earlier, the judge also ordered payment of child support to Ec-
cleston as Cailyn's "de facto parent." The record discloses that Eccleston was
a person appointed by the Commonwealth to care for Cailyn because of the
unfitness of both her parents, and thus was not a person in a parent-like
relationship with Cailyn with the voluntary consent of either parent, thus
undercutting Eccleston's claim to de facto parent status in this case. Cf.
*E.N.O.* v. *L.M.M.*, 429 Mass. 824, 830, 830-831, cert. denied, 528 U.S. 1005
(1999) (finding de facto parent status where both adult parties "decided to
have a child and to form a family," where they resided together as a family
with the child, where the "de facto parent" supported the family financially,
and where "[w]ith the [biological parent's] consent, the [third party]
participated in raising the child . . ."). See also ALI, Principles of the Law of
Family Dissolution: Analysis and Recommendations, *supra* at § 2.03(1)(c)(ii)
("agreement of a legal parent to form a parent-child relationship" required for
finding of de facto parentage). To the extent that the judge based his decision
on Eccleston's status as her former guardian for purposes of recognizing her
as a "de facto" parent, we also note that Eccleston's husband was appointed
coguardian, thus, under that theory, making him an equally "de facto" parent.
See note 3, *supra*. To date, this court has not addressed the economic ramifica-
tions (if any) of "de facto" parenthood, and we decline to do so here. Because
the judge had a sufficient basis to order child support to Eccleston under G. L.
c. 215, § 6, we do not reach the issue whether it was error for the judge to
order the father to pay child support to Eccleston as Cailyn's "de facto
parent."

Eccleston for equitable relief pursuant to G. L. c. 215, § 6. The judge should reinstate the support order and "take any other action consistent with general equity jurisprudence to assure that the interests of justice are served." *Feinberg* v. *Diamant, supra* at 137.

*So ordered.*

COWIN, J. (dissenting). The court today holds that a judge of the Probate and Family Court may order the payment of post-minority support to the plaintiff through the use of that court's general equity powers, G. L. c. 215, § 6. It does so despite its conclusion that the applicable statutory remedies, the "comprehensive legislative scheme providing postminority support to children of disrupted families," *ante* at 437, do not permit a probate judge to issue an identical order. I dissent because a judge may not act in equity in a manner contrary to statute, and because the court, in sanctioning such an action, has created a dangerous precedent.

The court's holding violates one of the oldest tenets of equity jurisprudence: equity must follow the law. 2 Pomeroy, Equity Jurisprudence § 425 (5th ed. 1941). This centuries-old principle holds that, where the law (either common or statutory) provides a remedy bounded by restrictions (as the court admits G. L. c. 208, § 28, does here), a court may not act in equity either to extend or to supplement that remedy. See *Hedges* v. *Dixon County*, 150 U.S. 182, 192 (1893); *Freeman* v. *Chaplic*, 388 Mass. 398, 406 n.15 (1983) ("a grant of equitable powers does not permit a court to disregard statutory requirements"); *Heard* v. *Stanford*, 25 Eng. Rep. 723, 723-724 (1736). The rationale behind this restriction is self-evident: if courts had the power to fashion equitable remedies for problems already addressed by legislation, they would be free to ignore any statutory remedies and restrictions that they deem inconvenient. They would become, in short, super-Legislatures.

The court has fallen prey to this temptation before, see *Adoption of Vito*, 431 Mass. 550, 570-571 (2000) (Cowin, J., concurring), and does so again today. The court makes the following

holdings: (1) There is a "comprehensive legislative scheme," *ante* at 437, regulating postminority educational support orders.[1] (2) The applicable portion of this legislative scheme, G. L. c. 208, § 28, cannot be interpreted to allow the Probate Court to grant educational support to Eccleston, because the Legislature intended to limit such payments to parents, and Eccleston is not Cailyn's parent. See *ante* at 433. (3) The Probate Court may, nevertheless, exercise its equitable powers to issue an *identical* order. See *ante* at 437. How, given the statutory command limiting postminority educational support to parents, does the court justify this final holding? The inescapable answer is that the court believes that it may ignore statutory restrictions when it acts in equity.

The court apparently is operating in the mistaken assumption that G. L. c. 215, § 6, allows the Probate and Family Court to fashion equitable remedies that run counter to statute, so long as the Legislature has not explicitly forbidden it to do so. That impression is both wrong and disingenuous. It is wrong because § 6 states specifically that the Probate and Family Court's equitable powers are limited by the general principles of equitable jurisprudence, and the rule that equity follows the law is one of those principles. See 2 Pomeroy, Equity Jurisprudence, *supra* at § 425. It is disingenuous because the court is well aware that the Legislature is not in the habit of prohibiting actions contrary to statute; it presumes that the courts will adhere to the restrictions its statutes impose. The Legislature enacts laws, not suggestions, and it assumes that courts understand this. The court has apparently failed to grasp that to act outside the bounds of a comprehensive legislative scheme is necessarily to act contrary to it:[2] in holding that a probate judge may award postminority support to a child pursuant to its equitable powers, regardless

---

[1]The court makes no attempt to suggest that postminority support is an area where the law provides no remedy. It cites, in fact, no less than five statutes that provide for some form of educational support beyond the age of eighteen years. See *ante* at 435-436.

[2]*Feinberg* v. *Diamant*, 378 Mass 131 (1979), on which the court relies as support for its decision, is not to the contrary. There we held that a parent has a common-law obligation to provide support for an incompetent adult child, see *id.* at 133-134. Because neither the statutory nor common law of the Commonwealth provided a remedy for this right, we authorized the Probate Court to fashion an equitable remedy. See *id.* at 136-137. The *Feinberg* case does

whether that child is domiciled with a parent or principally dependent on that parent, the court essentially eliminates two of the three statutory postminority support requirements contained in G. L. c. 208, § 28. Nor is there any reason to suppose that the third requirement is safe. Given that the reach of the Probate Court is now constrained only by "the long-term well being of the child," *ante* at 438, a probate judge could presumably grant a postminority support order to a deserving thirty year old "child" if the judge found justice so to require.

Although the court justifies its action as a means of avoiding "disadvantag[ing] an especially vulnerable class of children," *ante* at 437, it ignores the fact that in this case Cailyn has been disadvantaged, not by fate, but by statute. Children over the age of twenty-three years, children who do not live with their parents, and children who are independent of their parents (all of whom cannot receive educational support under § 28) are equally "disadvantaged." Crafting an additional statutory exception for the "vulnerable" is a legislative function; if the Probate and Family Court may fashion such an exception pursuant to its equitable powers, one wonders what purpose the statute itself actually serves.

The court attempts to minimize the import of its misuse of equity by stating that it acts only to "close an *unintended* gap in the comprehensive legislative scheme providing postminority support" (emphasis added). *Ante* at 437. The problem, of course, is that the characterization of the gap as "unintended" is inherently subjective. Gaps in legislative schemes do not come with labels, so there is nothing to stop us from classifying as "unintentional," when it suits us, a gap that the Legislature created by design. The rule that equity must follow the law was fashioned specifically to ensure that judges do not rewrite the law in this fashion.

The true import of today's opinion lies not in what it does but in what it portends. From this point forward when the Probate Court acts in equity it may ignore statutory boundaries

not, however, stand for the proposition that the Probate and Family Court may act in equity where, as here, a legal remedy *does* exist. See *Freeman* v. *Chaplic*, 388 Mass. 398, 406 & n.15 (1983) (Probate Court could not award custody pursuant to equitable powers contrary to statutory requirements).

and the gaps that those boundaries produce. The vast opportunities for judicial overreaching thus created are, by themselves, disturbing. The court's inability (or unwillingness) to recognize the problem, however, leads me to believe that future abuses will go uncorrected and become increasingly common. I must, therefore, dissent.