T.F. *vs.* B.L.

Hampshire. March 4, 2004. - August 25, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Contract,* Implied, "Parenthood by contract." *Parent and Child,* Child support. *Public Policy. Probate Court,* General equity power.

This court concluded that while the plaintiff established the existence of an implied agreement whereby the defendant, the plaintiff's nonmarital cohabitant, promised to undertake the responsibilities of a parent in consideration of the plaintiff's conceiving and bearing a child through artificial insemination by an anonymous sperm donor [526-527], "parenthood by contract" is not the law of Massachusetts and the agreement was unenforceable as against public policy [527-531]; therefore, the defendant had no obligation of child support and the Probate Court could not create such an obligation pursuant to its equity jurisdiction [531-534]. GREANEY, J., concurring in part and dissenting in part, with whom MARSHALL, C.J., and IRELAND, J. joined.

CIVIL ACTION commenced in the Hampshire Division of the Probate and Family Court Department on January 18, 2001.

The case was heard by *Gail L. Perlman,* J., and the matter was reported to the Appeals Court. The Supreme Judicial Court granted an application for direct appellate review.

*Bennett H. Klein* (*Karen G. Jackson* with him) for the plaintiff.

*Wendy H. Sibbison* for the defendant.

The following submitted briefs for amici curiae:

*Paula E. Berg* for Women's Bar Association of Massachusetts & others.

*John J. Weltman, Robert Nichols & Susan Crockin* for RESOLVE: The National Infertility Association & others.

COWIN, J. The plaintiff, T.F., and the defendant, B.L., are two women who lived together from 1996 to 2000. During this time, the plaintiff became pregnant through artificial insemination, and in July, 2000, after the couple had separated, she gave

birth to a child. In January, 2001, the plaintiff filed a complaint in the Probate and Family Court Department. Based on theories of promissory estoppel and breach of an oral contract,[1] she requested that the defendant be ordered to pay child support under the child support guidelines. See G. L. c. 119, § 28 (*d*). The judge found that there was an agreement "to create a child," which the defendant had breached. However, the judge did not issue an order of support. Instead, she reported the matter to the Appeals Court pursuant to G. L. c. 215, § 13, see *Gray* v. *Commissioner of Revenue*, 422 Mass. 666, 667 (1996), for a determination whether "parenthood by contract is the law of Massachusetts." If this question were answered in the affirmative, she opined, "then [the defendant] is a parent." We granted the plaintiff's application for direct appellate review. We conclude that while the plaintiff has established the existence of an implied agreement, "parenthood by contract" is not the law of Massachusetts and the agreement is unenforceable as against public policy. Therefore, this defendant has no obligation of child support and the Probate and Family Court cannot create such an obligation pursuant to its equity jurisdiction.

*Background.* We summarize the facts found by the Probate and Family Court judge, which findings were warranted by the evidence. The plaintiff and defendant met in 1995, and began living together in the fall of 1996. On May 30, 1999, the couple held a "commitment ceremony." Subsequently, they pooled their money and nominated each other as beneficiaries of their respective life insurance policies and retirement plans. The plaintiff had long wanted to have a child, and communicated her feelings to the defendant on several occasions. The first such conversation occurred as early as six months into the relationship. The defendant, who had grown up in an abusive household, doubted her own fitness to be a parent. She also had experienced psychological problems in the past, and was undergoing treatment for a recurrence of depression in the spring

---

[1] The breach of oral contract claim was added by an amended complaint filed on September 20, 2001. The initial complaint also included counts for "Application of [G. L. c. 209C, § 1,] to Determine Support Obligation" and "Equal Protection." The judge entered summary judgment for the defendant on these counts.

and summer of 1999. The defendant continued her resistance to having a child until one day in June or July of 1999, when she telephoned the plaintiff at work and told her that she had changed her mind. The plaintiff suggested they talk more about it that evening.

The couple did discuss the matter further (the 1999 conversation). They covered such topics as whether they would rather have a boy or a girl, the defendant's reasons for her change of heart, whether the defendant's brother would be a suitable sperm donor, baptism and schooling, and the division of labor between the couple, should they have a child. As a result of the 1999 conversation, the plaintiff scheduled an appointment with her doctor to discuss pregnancy. The plaintiff went to that appointment alone, but subsequently both parties attended appointments with a second doctor at a facility specializing in reproduction and fertility procedures (clinic). This doctor performed tests that disclosed that the plaintiff had a condition that would make pregnancy difficult and would require delivery by Caesarian section. The parties discussed whether the defendant could be the birth mother instead, but a degenerative disc in her back would have made pregnancy even more difficult for her. After rejecting other options such as adoption or a foster child, the parties decided to proceed with the plaintiff's artificial insemination.

On August 6, 1999, the clinic presented the couple with a document entitled "Consent Form: Therapeutic Donor Sperm Insemination."[2] The parties worked together to select an anonymous donor. The couple used joint funds for insemination and prenatal care expenses. The defendant's actions during this period were at least in part an effort to preserve her relationship with the plaintiff, which she believed would have suffered had she attempted to prevent the plaintiff from having a child. The defendant told her sister and a friend that, from the time of the 1999 conversation, she "went along" with having a baby because she got "tired of the arguments" and "didn't want to take [the plaintiff's] dream away."

[2]The consent form, among other things, memorialized the parties' agreement to hold the clinic and its personnel harmless for the support of any child born as the result of procedures performed there. Both the plaintiff and defendant signed the form in the space labeled "Recipient."

After one unsuccessful insemination, the parties discussed how many more such procedures they could afford, and agreed to go forward with a further attempt. In December, 1999, the plaintiff became pregnant as the result of the second insemination.

The parties' relationship deteriorated in the following months, and the defendant moved out of their apartment in May, 2000. Prior to leaving, the defendant expressed her regrets about being a "separated parent," said she desired to adopt the child, and "promised financial support and promised to talk later about the details since she wanted to just focus on the break-up of the relationship at that time." On July 1, 2000, the plaintiff went into premature labor and gave birth to a boy.

We recite the facts following the conception and birth of the child as they may be relevant to the parties' contractual intent. See *Martino* v. *First Nat'l Bank*, 361 Mass. 325, 332 (1972), quoting *Pittsfield & N. Adams R.R.* v. *Boston & Albany R.R.*, 260 Mass. 390, 398 (1927) ("There is no surer way to find out what parties meant, than to see what they have done"). The defendant visited the mother and child in the hospital several times, participated in selecting his name, and promised to provide support and to change her work hours to help raise him. During one of these visits, the defendant gave the plaintiff $800. On July 26, 2000, the defendant sent pictures of herself with the child, via the Internet, to friends accompanied by the message: "I hope you all enjoy the pics of my wonderful, beautiful boy." In October, 2000, the parties argued for over an hour about support for the child, who, as the result of his premature birth, required a great deal of medical attention. The plaintiff had been parenting the child and working full time, and wanted financial assistance from the defendant. The defendant "acknowledged that she was not paying child support because she was angry at [the plaintiff]." Later that month, the defendant sent a letter to the plaintiff, declaring that she desired no further contact with the plaintiff or the child.

The judge found that there was no written agreement between the parties regarding having a child together, that the defendant is not biologically related to the child, and that she has never lived with him. The judge found further that the defendant's

name does not appear on the birth certificate, that she did not adopt the child, and that she has made no financial contributions for the benefit of the child, except the payment of $800 to the plaintiff shortly after the baby was born.

Analyzing the facts, the judge concluded that there was no evidence of an explicit oral promise by the defendant, except to "explore the possibility of having a child." However, the judge concluded that this promise, because of the defendant's subsequent behavior and failure to "stop or slow down" the plaintiff's pregnancy, "grew naturally and actively into the creation of a child," and thus the creation of a binding contract between the parties. The defendant breached this contract, the judge continued, by refusing to perform the obligations of parenthood (i.e., to provide child support).

*Analysis.* The plaintiff's argument for imposing a child support obligation on the defendant is essentially two pronged. First, she claims that the defendant entered into an enforceable implied contract with her to coparent a child, or at least that she impliedly promised to support the child, and is now estopped from denying that support. The defendant's refusal to pay child support, the argument goes, is therefore a breach of contract. Second, the plaintiff asserts that an order of child support in the present situation would be consistent with oft-expressed legislative policies as manifested in related statutes, and that the "broad and flexible" equity powers of the Probate and Family Court can and should be invoked to implement said polices. We discuss these arguments in turn.

a. *"Parenthood by contract."* The plaintiff does not contend that there was any express written agreement between the parties,[3] but rather that the defendant's initial statement, in the summer of 1999, that she wished to discuss having a child, followed by her course of conduct, reflect an implied contract to create a child. In the absence of an express agreement, an implied contract may be inferred from (1) the conduct of the

---

[3]The clinic "consent form" is not a written contract between the plaintiff and the defendant, for its primary purposes were to explain the risks of the insemination procedure and to define the couple's legal relationship as a unit with the clinic. See *A.Z. v. B.Z.*, 431 Mass. 150, 158 (2000). That form does not state, nor does the record show, that the parties intended it to act as, or be a part of, any binding agreement between them. See *id.*

parties and (2) the relationship of the parties. See *W.A. Snow Iron Works, Inc.* v. *Chadwick*, 227 Mass. 382, 390 (1917); *Li-Donni, Inc.* v. *Hart*, 355 Mass. 580, 583 (1969). See also *Grant* v. *Carlisle*, 328 Mass. 25, 29 (1951). An implied contract requires proof that there was a benefit to the defendant, that the plaintiff expected the defendant to pay for that benefit, and that the defendant expected, or a reasonable person should have expected, that he or she would have to pay for that benefit.[4] *Li-Donni, Inc.* v. *Hart, supra* at 583. When the defendant was, or should have been, aware of the plaintiff's expectations in this regard, the defendant's failure to object can create a contract. E.g., *Therrien* v. *Leblanc*, 282 Mass. 328, 331 (1933); *Maynard* v. *Fabyan*, 267 Mass. 312, 315 (1929). The defendant's subjective intent is irrelevant when she knows or has reason to know that her objective actions manifest the existence of an agreement. See Restatement (Second) of Contracts § 19 (1981).

In this case, the evidence warranted the judge's finding that there was an agreement by the defendant to undertake the responsibilities of a parent in consideration of the plaintiff's conceiving and bearing a child. Although the defendant claims that the plaintiff should not have relied on her passive silence, the judge reasonably concluded that the circumstances and relations of the parties, as stated in her findings, told a different story. The parties cohabited for several years as a couple, pooling all their financial resources. After the 1999 conversation, the plaintiff agreed to conceive and give birth to a child. Following this agreement, the defendant not only did not object, but actively participated in medical decisions and procedures, and in discussions about the child's future and the finances related to the conception and raising of the child. Furthermore, the judge found that the defendant intentionally manifested an outward desire to have a child in order to maintain her relationship with the plaintiff. A finding of an implied contract based on these facts, while not compelled, was certainly permissible.[5]

The conclusion does not end our analysis; the question

---

[4]We do not address the issue of consideration but assume, without deciding, that there was consideration for this contract.

[5]The dissent agrees that the judge permissibly could have found that the defendant entered into an agreement with the plaintiff "to create a child," and

remains whether the court can enforce this contract. Contracts between unmarried cohabitants regarding property, finance, and other matters are normally enforceable. See *Wilcox* v. *Trautz*, 427 Mass. 326, 332 (1998). Such contracts may concern the welfare and support of children, provided they do not contravene the best interests of the child. *Id.* at 334 n.7. See *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 831, cert. denied, 528 U.S. 1005 (1999).[6] Contracts between unmarried same-sex couples concerning the welfare and support of a child stand on the same footing as any other agreement between unmarried cohabitants. See *id.* at 831 n.9. However, when a contract violates or conflicts with public policy, we treat it as void and will not enforce it. *A.Z.* v. *B.Z.*, 431 Mass. 150, 160 (2000), and cases cited. *Beacon Hill Civic Ass'n* v. *Ristorante Toscano, Inc.*, 422 Mass. 318, 320-321 (1996). *Parsons* v. *Trask*, 7 Gray 473, 476-477 (1856). Contrast *Green* v. *Richmond*, 369 Mass. 47, 49-52 (1975). This is such a contract.

In *A.Z.* v. *B.Z.*, *supra* at 159-160, we refused to enforce an agreement that compelled a party "to become a parent against his or her will." In that case, the plaintiff successfully prevented his estranged wife from using his own sperm (which had been frozen and stored by an in vitro fertilization clinic) to create a child. *Id.* at 150-153. "[F]orced procreation," we concluded, "is not an area amenable to judicial enforcement." *Id.* at 160. The present case is factually distinguishable in that the defendant's contribution to the conception and birth of the child arose from contractual intent rather than from her genetic material.

sets out a portion of the judge's findings in an Appendix. *Post* at 535. However, the dissent has not included in this Appendix other findings by the judge, such as the defendant's earlier refusals to become a parent, her mental health issues, and the judge's findings that there was no written agreement and neither an adoptive nor biological relationship between the defendant and the child.

[6]We disagree with the dissent's assertion that "parenthood by contract" would weaken the "best interests" standard. *Post* at 535. Where a person's obligation to support a child is established, a court uses the "best interests" standard to measure whether and how that obligation is being fulfilled. However, this standard is irrelevant unless and until the person in question has a legal relationship to the child. Here, where there is no legal relationship (other than an unenforceable contract), the "best interests" standard does not come into play.

However, important concerns underlying that decision also apply here.

We determine public policy by looking "to the expressions of the Legislature and to those of this court." *Id.* at 160-161, citing *Capazzoli* v. *Holzwasser*, 397 Mass. 158, 160 (1986). In the *A.Z.* case we noted that, by statute, a contract to enter into a marital relationship is not enforceable. *Id.* at 161, citing G. L. c. 207, § 47A. We also discussed earlier cases that had "indicated a reluctance to enforce prior agreements that bind individuals to future family relationships." *Id.*, citing *R.R.* v. *M.H.*, 426 Mass. 501, 510 (1998) (agreement by which surrogate mother agreed to give up child at birth was unenforceable unless agreement contained, inter alia, "reasonable" waiting period consistent with waiting period in adoption surrender); *Capazzoli* v. *Holzwasser, supra* at 160-161 (contract requiring individual to abandon marriage unenforceable). See *A.R.* v. *C.R.*, 411 Mass. 570, 574-575 (1992) (where plaintiff was not biological father of two children, he could not be equitably estopped from denying paternity based on representations he made to their mother).[7] We concluded that in order to protect the "freedom of personal choice in matters of marriage and family life," *A.Z.* v. *B.Z., supra* at 162, quoting *Moore* v. *East Cleveland*, 431 U.S. 494, 499 (1977), "prior agreements to enter into familial relationships (marriage or parenthood) should not be enforced against individuals who subsequently reconsider their decisions." *A.Z.* v. *B.Z., supra.*

The principles expressed by this court in *A.Z.* v. *B.Z., supra*, are applicable, and of like force, in the present case. The decision to become, or not to become, a parent is a personal right of

---

[7]In *A.R.*v. *C.R.*, 411 Mass. 570, 575-576 (1992), we stated that "[i]t may be that, as a matter of public policy, an affirmative duty to support, perhaps based on an express or implied promise, should be recognized on the particular facts of a case . . . ." This proposition does not apply to the present case. The context of the quotation is a discussion of promises that a putative father may make to a child, not to the biological mother, by voluntarily undertaking a support obligation and then holding "himself out as the father to the child and to the world." *Id.* at 575. See *Liebson* v. *Liebson*, 412 Mass. 431, 433-434 (1992) (defendant, who had voluntarily supported and lived with his wife's niece for eleven months, and who shared joint physical custody of niece during that period, was not equitably estopped from denying support obligation after divorce).

"such delicate and intimate character that direct enforcement . . . by any process of the court should never be attempted." *Id.*, quoting *Kenyon* v. *Chicopee*, 320 Mass. 528, 534 (1946). "Parenthood by contract" is not the law in Massachusetts, and to the extent the plaintiff and the defendant entered into an agreement, express or implied, to coparent a child, that agreement is unenforceable.[8,9]

The dissent acknowledges that the agreement to create a child was unenforceable, but insists that this agreement "includes" an enforceable promise to pay child support. *Post* at 535. Our authority to enforce the lawful portion of an otherwise illegal contract depends on whether that portion is severable from the larger agreement. *Bishop* v. *Palmer*, 146 Mass. 469, 474 (1888) ("If the bad part of the consideration is not severable from the good, the whole promise fails"). In the present case, the appropriate inquiry is whether there was a specific identifiable agreement to support the child contained within the implied contract to create and parent the child, and, if so, whether that agreement is severable from the implied contract. The Probate and Family Court judge suggested that an agreement to become a parent inherently involves four promises: (1) that the "parties will continue to love the child," (2) "support each other," (3) "provide child care," and (4) "provide financial support for the child." Nothing in the record gives substance or meaning to any specific promise to provide child support separate and apart from the implied agreement to create a child; support was, as the judge stated, one of the inherent consequences of parenthood. Furthermore, where a portion of a contract is separably enforceable, that portion would ordinarily confer delineated benefits and obligations on both sides. E.g.,

---

[8]Concluding, as we do, that there was an implied contract to create a child but that it was unenforceable, we need not address the plaintiff's promissory estoppel argument. The same public policy considerations apply to this alternative theory of recovery.

[9]In light of our conclusion that a contract to become a parent is unenforceable as against public policy, we do not consider the defendant's contention that such agreements must be in writing. Although our past cases evince a preference for written contracts between unmarried cohabitants, see, e.g., *Wilcox* v. *Trautz*, 427 Mass. 326, 330 (1998), we have never announced such a requirement, and we decline to do so here.

*Carrig* v. *Gilbert-Varker Corp.*, 314 Mass. 351, 357-358 (1943).
But here, nothing in the record shows a distinct consideration in
return for child support apart from the core, unenforceable
promise to coparent. Therefore, any implied promise that the
defendant made respecting child support is inextricably linked
to her unenforceable promise to coparent the child, and is
similarly unenforceable.[10]

b. *Equity power of the Probate and Family Court.* The
plaintiff and the dissenting Justices do not rely exclusively on
contract theory, but also invoke the equity powers of the Probate
and Family Court, arguing, as the dissent puts it, that "[t]he
existence of an agreement to support on the part of the
defendant, buttressed by society's interests (as expressed
through our statutes and our case law) and the best interests of
the child standard, requires relief here." *Post* at 538. Although
the dissenting justices acknowledge that "our statutes offer the
plaintiff no remedy, because the defendant is not a legal par-
ent," *id.* at 536-537, they would nevertheless enforce a support
obligation by hypothesizing the Legislature's probable intent,
and invoking the Probate and Family Court's general equity
power and its mandate to care for and protect the "best

---

[10]The dissent's conclusion that "parenthood by contract" is not the law, yet
that a separate support obligation may nevertheless be imposed on a nonparent,
is conspicuously silent on the possible ramifications of such a conclusion. See
*post* at 535-536. Given the unprecedented nature of imposing a long-lasting sup-
port obligation independent of parenthood, we have no recognized legal
principles for determining the defendant's status. For example, although the
defendant voluntarily ceased visitation, would she have visitation rights, or
some right to resume contact with the child, that she could seek to enforce?
While presumably not having a right to custody, would she have any say in
some aspects of the child's care, or at least in those aspects that would
profoundly affect her own financial obligations (e.g., the decision to send the
child to private as opposed to public school)? What if the plaintiff marries and
her spouse wants to adopt the child? With an adoptive second parent to provide
support, would there still be a basis for continuing the defendant's obligation?
What if the plaintiff dies, or becomes incapable of caring for the child? Would
the defendant then have the obligation (or the right) of full custody? Given the
novel and unprecedented status the defendant would have under the dissent's
theory, the Probate and Family Court would be called on to supervise the
relationship between the parties and the child for many years to come, and none
of them would fully comprehend their rights and obligations until each such
right and obligation gave rise to a disagreement and was later defined by way of
litigation.

interests" of children. *Id.* at 537-538. This argument, however informed by genuinely good intentions, misapprehends the extent and purpose of the Probate and Family Court's equity powers. The equity powers conferred by the Legislature on the Probate and Family Court are intended to enable that court to provide remedies to enforce existing obligations; they are not intended to empower the court to create new obligations.

The duty to support a minor child is statutory. *L.W.K.* v. *E.R.C.*, 432 Mass. 438, 443 (2000). *Gediman* v. *Cameron*, 306 Mass. 138, 140 (1940), and cases cited.[11] See, e.g., G. L. c. 208, § 28; G. L. c. 209, § 37; G. L. c. 209C, § 9. A parent's duty to support his child financially has existed by statute in some form since as early as 1692. *Commonwealth* v. *Chase*, 385 Mass. 461, 469 (1982); Province Laws 1692-1693, c. 18, § 5. Over time, the Legislature has created a comprehensive statutory scheme governing child support, see *Orlandella* v. *Orlandella*, 370 Mass. 225, 227 (1976), imposing that duty on a person who acknowledges paternity or is adjudicated the father. *Commonwealth* v. *Chase*, *supra*. The dissent highlights statutory language that "dependent children shall be maintained, as completely as possible, from the resources of their parents," *post* at 536, but ignores that the Legislature has reserved this duty for *parents*. See *L.W.K.* v. *E.R. C.*, *supra* at 444 ("parents have an obligation to support their minor children").

The Legislature has identified those persons who are liable as parents to support their children. See, e.g., G. L. c. 209C, § 1 (person who is adjudicated father of child born out of wedlock); G. L. c. 210, § 6 (person who adopts child). In addition, G. L. c. 46, § 4B, provides that, if the spouse of a woman who undergoes artificial insemination consents to the procedure, that spouse is considered the legitimate parent of a resulting child, and is thus obligated to pay child support. But the Legislature has not addressed the situation, present in this case, where a nonmarital cohabitant consents to such a procedure. This absence of legislative action is not a nod in our direction.

---

[11] At common law, a father having sufficient financial ability was bound to support those of his children who lived with him. *Creeley* v. *Creeley*, 258 Mass. 460 (1927).

Here, the defendant is not a parent of the child under any statutory provision. She has not become a "de facto" parent by virtue of a long-term relationship with the child. Contrast *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 830 (1999); *Youmans* v. *Ramos*, 429 Mass. 774, 776 (1999).[12] Apart from the unenforceable contractual obligation found by the Probate and Family Court judge, the defendant is legally a stranger to the child. Because the defendant is not a parent under any of the statutory provisions enacted to establish parenthood, she has no duty to support the child financially, and she may not be ordered to pay child support.

Because nonparents have no duty to pay child support absent a statutory duty, equity does not provide a remedy in this case. "It is a maxim that equity follows the law as declared by a statute." *Rossi Bros.* v. *Commissioner of Banks*, 283 Mass. 114, 119 (1933). 2 J.N. Pomeroy, Equity Jurisprudence § 425 (5th ed. 1941). The "grant of equitable powers does not permit a court to disregard statutory requirements." *Freeman* v. *Chaplic*, 388 Mass. 398, 406 n.15 (1983). Equitable principles cannot be used to create a duty to pay child support where the law does not recognize a legally cognizable parent-child relationship. Cf. *C.M.* v. *P.R.*, 420 Mass. 220 (1995) (visitation). Similarly, we cannot infer that a void in the comprehensive statutory scheme that imposes an obligation of child support on parents authorizes us to fill that void by legislating an outcome that suits us. See *Alguila* v. *Safety Ins. Co.*, 416 Mass. 494, 499 (1993) (circumstance not accounted for in statute does not permit judicial legislation).[13] Equity is not an all-purpose judicial tool by which

[12]To date, we have not considered whether a "de facto" parent has an obligation to support a child, and we express no opinion on that issue. We merely point out that the defendant had no relationship with the child and would not qualify as a "de facto" parent.

[13]The dissent cites to the American Law Institute's Principles of the Law of Family Dissolution: Analysis and Recommendations § 3.03(1) (2000), which recommend imposing parental obligations by agreement even where the person may not be a parent under State law. *Post* at 539-540 & n.4. While § 3.03(1) would provide some definition limiting the types of persons who could potentially be subject to an order of support, the articulation of the factors to be considered concludes with the open-ended invitation to base a support order on "any other facts that may relate to the equity of imposing a parental

the "right thing to do" can be fashioned into a legal obligation possessing the legitimacy of legislative enactment.

Similarly, the "best interests of the child" is not a free-floating concept that empowers probate judges to impose legal obligations on people who have no legal obligations to begin with. The Legislature has specifically defined when the "best interests of the child" standard is to be applied and has tailored the factors to be considered, depending on the nature of the proceeding. See, e.g., G. L. c. 210, § 3 (c) (granting petition for adoption without requiring parental consent in certain circumstances); G. L. c. 208, § 28 (care, custody, and maintenance of child after divorce); G.L. c. 119, § 23 (foster care).

It may be the case that a child is better off with two persons responsible for providing support than with only one such person, and that it will always be in the child's "best interest" to impose a support order on some second person. But that second person may not be imposed on, by way of equity or the "best interests" standard, until and unless the Legislature establishes that he or she is among a class of persons who have a legal obligation to the child. The "best interests" standard in and of itself is not a mechanism by which courts may reach beyond the law to obtain an equitable result. See, e.g., *Commonwealth* v. *Leno*, 415 Mass. 835, 841 (1993).

In response to the Probate and Family Court judge's report of the matter, we conclude that "parenthood by contract" is not the law in Massachusetts. This case is remanded to the Probate and Family Court for further proceedings consistent with this opinion.

*So ordered.*

GREANEY, J. (concurring in part and dissenting in part, with whom Marshall, C.J., and Ireland, J., join). An obligation to support a child can be created by express or implied agreement (as the court recognizes because the proposition is indisputable)

support duty on the person." Principles of the Law of Family Dissolution: Analysis and Recommendations, *supra* at § 3.03(2)(d), at 415. Given the elusive nature of this definition, and the magnitude of the obligations being imposed, the task is better left to the Legislature and not to individual judges.

or by conduct showing that the party to be charged has affirmatively committed to the obligation (equally indisputable). Based on the strong findings of the judge in the Probate and Family Court, there is an enforceable obligation to pay support here.

a. I agree that parenthood by contract is not the law in Massachusetts, for the reason, if no other, that parenthood is a status conferred by law and not one that can be conferred by a private agreement to which the child is not (and cannot be) a party. See *R.R.* v. *M.H.*, 426 Mass. 501, 512 (1998). Both the Legislature and this court have stated many times, and in many contexts, that the Probate and Family Court has full authority to review any agreement within its purview that implicates a child's best interests. Parenthood by contract could oust, or at least weaken, the established power of the court to protect the child's best interests. See, e.g., *White* v. *Laingor*, 434 Mass. 64, 66 (2001); *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 831 n.9, cert denied, 528 U.S. 1005 (1999), citing *Wilcox* v. *Trautz*, 427 Mass. 326, 334 & n.7 (1998); *Adoption of Thomas*, 408 Mass. 446, 449-450 (1990).

b. The inquiry, however, does not end here. The judge, who heard testimony from eight witnesses and examined numerous exhibits during three days of trial, made careful findings and concluded that: "The decision to create this child was even more conscious and deliberate than the decision that is made by some couples who are both biological parents and conceive a child by direct sexual intercourse. That was the agreement: to create a child. First the parties explored the ways to accomplish that agreement and then they went forward together to accomplish it." The defendant cannot be held to be a parent by contract, but her agreement with the plaintiff includes a promise to support the child that she and the plaintiff agreed to create (by way of artificial insemination) and to parent together. That promise to support is well established by the judge's findings and should not be facilely cast aside as the court does. Because strict adherence to the facts is critical to my analysis, I set forth verbatim, in an Appendix, those findings on which I ground my conclusion that promises were made to parent (that are unenforceable) and to support (that are enforceable). A person

cannot participate, in the way the defendant did, in bringing a child into the world, and then walk away from a support obligation.

The plaintiff ultimately seeks an order of child support. The Legislature has long recognized the importance of child support for all children. It has expressed, in unmistakable terms, that "dependent children shall be maintained, as completely as possible, from the resources of their parents" and not by the taxpayers, and that support determinations should be made in "the best interests of the child." G. L. c. 119A, § 1. G. L. c. 209C, § 9 (c). See *Department of Revenue* v. *Mason M.*, 439 Mass. 665, 669 (2003); *L.W.K.* v. *E.R.C.*, 432 Mass. 438, 444 & n.17 (2000). With respect to children born out of wedlock, the Legislature has declared that "[c]hildren born to parents who are not married to each other shall be entitled to the same rights and protections of the law as all other children." G. L. c. 209C, § 1. See *Youmans* v. *Ramos*, 429 Mass. 774, 780 (1999). The Legislature has in many ways "affirmatively supported the assistive reproductive technologies" that enable couples to conceive children in the absence of sexual intercourse. *Woodward* v. *Commissioner of Social Sec.*, 435 Mass. 536, 546-547 (2002), citing G. L. c. 46, § 4B; G. L. c. 175, § 47H; G. L. c. 176A, § 8K; G. L. c. 176B, § 4J; G. L. c. 176G, § 4. In G. L. c. 46, § 4B, the Legislature made clear that the parentage of children born as a result of artificial insemination does not depend on biology but may be determined on the basis of consent. See *R.R.* v. *M.H.*, *supra* at 510 (§ 4B "concern[s] the status of a child born to a fertile mother whose husband, presumably infertile, consented to her artificial insemination with the sperm of another man so that the couple could have a child biologically related to the mother"). We have stated that "[r]epeatedly, forcefully, and unequivocally, the Legislature has expressed its will that all children be 'entitled to the same rights and protections of the law' regardless of the accidents of their birth." *Woodward* v. *Commissioner of Social Sec.*, *supra* at 546. The Legislature has yet to contemplate the situation here.

The plaintiff's resort to the equity jurisdiction of the Probate and Family Court is entirely appropriate. That our statutes offer the plaintiff no remedy, because the defendant is not a legal par-

ent, does not preclude an order of child support. Cf. *E.N.O.* v. *L.M.M.*, *supra* at 828 & n.4 (visitation). The Legislature has declared that the Probate and Family Court "shall have original and concurrent jurisdiction with the supreme judicial court and the superior court department of all cases and matters of equity cognizable under the general principles of equity jurisprudence and, with reference thereto, shall be courts of general equity jurisdiction." G. L. c. 215, § 6. This grant of equitable power is plenary and "extends to actions necessary to afford any relief in the best interests of a person under [the court's] jurisdiction." *Matter of Moe*, 385 Mass. 555, 561 (1982). See *Eccleston* v. *Bankosky*, 438 Mass. 428, 437 (2003). See also *Police Comm'r of Boston* v. *Municipal Court of the Dorcester Dist.*, 374 Mass. 640, 660-665 (1978). This authority extends as well to the specific enforcement of agreements, including, as here, one to support a child. See *Ross* v. *Ross*, 371 Mass. 439, 439-440 (1976) (separation agreement); *Suga* v. *Maum*, 29 Mass. App. Ct. 733, 736 (1991) (agreement to convey land); *Ross* v. *Friedman*, 22 Mass. App. Ct. 513, 515-516 (1986) (agreement to sell shares of stock).[1] It is also significant that, in 1986, the Legislature built on the Probate and Family Court's general equity jurisdiction by authorizing it to hear complaints to establish paternity or to order child support for children born out of wedlock and vesting it with sole jurisdiction to decide requests for custody and visitation of such children. G. L.

---

[1] The court's power to compel compliance with an agreement is not limited to circumstances where performance is promised in return for traditional consideration but includes those where the party held liable is bound by another's reasonable reliance on the promise. We do not use the term "promissory estoppel," but have treated the principles of estoppel as sufficient to create a contract. See *Cataldo Ambulance Serv., Inc.* v. *Chelsea*, 426 Mass. 383, 386 & n.6 (1998); *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757, 760 (1978). The prerequisites for a successful claim based on a theory of promissory estoppel are met in this case: (1) promises to parent and support a child that (2) the defendant should reasonably have known would cause the plaintiff to proceed with their joint plan for her to become pregnant by means of artificial insemination (3) which the plaintiff did (4) justifiably relying on the defendant's affirmative conduct and promises, leaving the plaintiff in circumstances such that (5) injustice (to the plaintiff and to the child) can be avoided only by enforcement of the promise to support.

c. 209C, § 3, inserted by St. 1986, c. 310, § 16.[2] The Legislature, thus, has conferred on the Probate and Family Court broad equitable authority (including the power to compel specific performance) that, although not unbounded, extends to deciding many specific and complex child-related issues that have not been foreseen by statute. See *E.N.O.* v. *L.M.M.*, *supra* at 827-828; *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 755-756 (1977). See also, e.g., *Eccleston* v. *Bankosky*, *supra* at 437; *Culliton* v. *Beth Israel Deaconess Med. Ctr.*, 435 Mass. 285, 291-292 (2001); *E.N.O.* v. *L.M.M.*, *supra* at 833-834; *Youmans* v. *Ramos*, *supra* at 779-780; *Gardner* v. *Rothman*, 370 Mass. 79, 80 (1976).

The existence of an agreement to support on the part of the defendant, buttressed by society's interests (as expressed through our statutes and our case law) and the best interests of the child standard, requires relief here.[3] See *A.R.* v. *C.R.*, 411 Mass. 570, 575-576 (1992). This conclusion finds support in decisions of courts in other jurisdictions involving facts of a similar nature. See Chambers *vs.* Chambers, No. CN 00-09493 (Del. Fam. Ct. Feb. 5, 2002); *L.S.K.* v. *H.A.N.*, 813 A.2d 872, 878-879 (Pa. Super. Ct. 2002). See also *In re Marriage of Buzzanca*, 61 Cal. App. 4th 1410, 1412 (1998). But see *State ex rel. D.R.M.* v. *Wood*, 109 Wash. App. 182, 189, 195 (2001) (conclud-

---

[2]Long before the enactment of G. L. c. 209C, however, the law imposed a duty on parents "to support, provide for and protect the children they bring forth" (at least those children brought forth in a traditional family context). *Commonwealth* v. *Brasher*, 359 Mass. 550, 556 (1971), citing 1 Blackstone, Commentaries 446-454 (9th ed.).

[3]My analysis would be no different were the defendant an unmarried male partner who purposefully put himself in the position of a parent, by taking affirmative steps that resulted in the birth of a child whom he considered, for a time, to be his son, but subsequently attempted to disavow all of his parental responsibilities when his relationship with the child's mother deteriorated. This case is not about establishing parental rights of same-sex couples. It is about the defendant's taking financial responsibility for a child whom she had promised, by words and deeds, to support. When two adults decide together to create a child by way of artificial insemination, and agree together to assume financial responsibility for that child, and their decision and subsequent conduct leads to the birth of a child, that child is no less entitled to the financial support of both adults than had the adults been married, or had the child been conceived through sexual intercourse and thus was biologically linked to both adults.

ing that mother's former same-sex partner not obligated to pay child support because not parent under Uniform Parentage Act).

The conclusion is also in accord with those principles of the American Law Institute's (ALI) Principles of the Law of Family Dissolution, which, insofar as this case is concerned, recommend imposing a parental support obligation on a "person who may be not the child's parent under [S]tate law, but whose prior course of affirmative conduct equitably estops that person from denying a parental support obligation to the child." ALI Principles of the Law of Family Dissolution: Analysis and Recommendations § 3.03 & comment c (2002).[4] Section 3.03(1)(c) allows imposition of an order of support when a child is conceived "pursuant to an agreement between the person [to be charged] and the child's parent that they would share responsibility for raising the child and each would be a parent to the child." Where the conception of a child is achieved

---

[4]Section 3.03 (1) of the American Law Institute's (ALI) Principles of the Law of Family Dissolution: Analysis and Recommendations (2002) provides that a support obligation may arise when:

"(a) there was an explicit or implicit agreement or undertaking by the person to assume a parental support obligation to the child;

"(b) the child was born during the marriage or cohabitation of the person and the child's parent; or

"(c) the child was conceived pursuant to an agreement between the person and the child's parent that they would share responsibility for raising the child and each would be a parent to the child."

In determining whether a support obligation is justified, § 3.03(2) of the ALI Principles directs that a judge should consider:

"(a) whether the person and the child act toward each other as parent and child and, if so, the duration and strength of that behavior;

"(b) whether the parental undertaking of the person supplanted the child's opportunity to develop a relationship with an absent parent and to look to that parent for support;

"(c) whether the child otherwise has two parents who owe the child a duty of support and are able and available to provide support; and

"(d) any other facts that may relate to the equity of imposing a parental support duty on the person."

through artificial insemination, comment c suggests that, in the case of married or unmarried couples that execute a procreation agreement, the man "is to be treated as the father for purposes of child support." *Id.* at 417. In the case of same-sex couples that "wish to have children together [by way of] a sperm dona- tion or a surrogate mother," a support obligation may be imposed on a party "who is not a parent but who has made a [§ 3.03(1)(c)] agreement with the child's parent."[5] *Id.*

In summary: even though we do not recognize parenthood by contract, an agreement between the parties has been proved, which includes a promise of support, and the Probate and Fam- ily Court, acting under G. L. c. 215, § 6, has jurisdiction to hear the case and specifically to enforce that promise.[6] That the defendant may regret her words and conduct, and view the remedy as harsh, is of no consequence. Equity does not relieve from difficult agreements simply because they are regretted. The child may have been abandoned by the defendant, but he should not be abandoned by the court.

---

[5]Nowhere in the ALI Principles does it state the requirement that this agree- ment need be in writing. Moreover, comment b of § 2.03, setting forth defini- tions for purposes of determining custodial responsibilities for children, makes clear that "[a] formal, written agreement is not required to create a parent-by- estoppel status." Principles of the Law of Family Dissolution: Analysis and Recommendations, *supra* at § 2.03 comment b, at 114 (allowing, however, that "the absence of formalities may also affect the factfinder's determination of whether an agreement was made"). The proviso in § 7.04(1), cited by the defendant, that "[a]n agreement is not enforceable if it is not set forth in a writing signed by both parties," is not determinative in this case. *Id.* at 960. The entire text of chapter 7, as well as its accompanying comments and il- lustrations, demonstrates that § 7.04 contemplates premarital, marital, and separation agreements, and not agreements purporting to assume responsibility for parenting a child.

[6]The court's concerns over what rights, if any, the defendant, if ordered to pay child support, might seek in the future with respect to the child address is- sues that are beyond the scope of this opinion. *Ante* at 531 n.10. A relation- ship of financial support between the defendant and the child arguably could entitle the defendant to concomitant rights and responsibilities which, if as- serted, would be considered by a judge in the Probate and Family Court under general principles of family law and the best interests of the. child. Speculation as to such matters, however, is not a proper basis on which to deny the relief sought here. The same types of concerns have been raised, and dealt with, in other cases presenting novel or difficult family law issues. See, e.g., *Blixt* v. *Blixt*, 437 Mass. 649, 664-665 (2002), cert. denied, 537 U.S. 1189 (2003); *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 832-833, cert. denied, 528 U.S. 1005 (1999); *Adoption of Tammy*, 416 Mass. 205, 214-215 (1993).

T.F. *v.* B.L.

APPENDIX.

"33. In June of July, 1999, [the defendant] called [the plaintiff] at work and told her that she had changed her mind and that she wanted to have a child. [The plaintiff], surprised and interrupted in the middle of a busy work day, suggested that they talk more about it that evening.

"34. In the evening, the discussion continued. According to [the plaintiff], it was a long and detailed discussion lasting though dinner and far into the night. She recalled 'lots of excitement and fear' on the part of each of the parties. The discussion included (a) [the defendant's] statement that she had always wanted a boy, felt more comfortable with a boy; (b) [the plaintiff's] repeatedly asking, 'are you sure?' and 'What made you change your mind?'; (c) the possibility of using [the defendant's] brother's sperm; (d) the ethics of sperm donation; (e) [the defendant's] dream of driving with a little son with sun glasses on; (f) the division of labor between them for household chores; (g) the need for bigger housing; (h) a school district for the child; (i) Baptism and the selection of Godparents; (j) [the plaintiff's] own physical problems and the risk of pregnancy, and their agreement that there would be no pregnancy if the medical risks were too great to [the plaintiff] because [the defendant] did not want to risk losing [the plaintiff].

"45. According to [the plaintiff], the parties discussed whether or not to continue with the insemination. They discussed the alternatives of adoption and a foster child. They discussed the idea of [the defendant's] being the birth mother. Because [the defendant] has a degenerative disk in her back and would have had an even more difficult pregnancy than [the plaintiff], the parties decided to continue with the process of [the plaintiff's] insemination.

"47. [The defendant] determined that it would, in [the plaintiff's] words, 'be too weird' to raise her brother's child as her own, and the parties determined to go forward with insemination by an anonymous sperm donor.

"48. At the next appointment, on August 6, 1999, the parties both signed the Consent Form, Donor Insemination. The document was signed in front of an employee of [the physician] after approximately [forty-five] minutes of discussion with a nurse.

"53. The same issues which had informed their earlier discussions continued to be discussed between the parties: the expenses involved in raising a child, their excitement, their fears, jokes about what they would do if the child were a girl. They brainstormed solutions to their fears and poked fun at each other.

"55. The first insemination occurred in October, 1999, in [the physician's] office. Both parties were present. It was not a successful insemination. The parties felt upset. [The plaintiff] reported that [the defendant] put her head down and shook it at news of the failure.

"56. Each insemination cost $250.00. The parties discussed how many they could afford and agreed to purchase two. They deferred any discussion of what to do if the second one failed.

"57. The second insemination, which took place in December, 1999, was successful.

"62. In February and early March, 2000, the parties' relationship deteriorated. Though they lived together, [the defendant] began to go out more frequently with [a friend].

"63. The parties' discussions about the pregnancy continued throughout February and March.

"64. In April, 2000 [the defendant] broke up with [the plaintiff]. In sometimes intense conversations, [the defendant] would express tearfully her concern that she would be the 'separated parent' and not see the child as much, that she wanted to adopt the child, promised financial support and promised to talk later about the details since she wanted just to focus on the break-up of the relationship at that time. [The defendant] said she never wanted to do what her own father did in abandoning the child and refusing to pay child support.

"65. In May, 2000 [the defendant] moved out of the apartment, and the parties divided their joint money. By that time they were no longer speaking to each other.

"66. The parties paid for all expenses of insemination and pre-natal care from their joint funds.

"67. On July 1, 2000, [the plaintiff] went into premature labor [and] gave birth to [the child] 9 weeks early.

"68. [The plaintiff] was in shock and disbelief, but she was physically in good condition. The baby did not need to be delivered by Caesarian section. He was, however, in such serious condition that he was rushed away from her at birth, and she was not even able to see his face.

"69. [The defendant], in response to a telephone call from [the plaintiff's] sister, arrived at the hospital approximately an hour after the birth.

"70. The parties saw the child together for the first time. [The defendant] gave [the child] his first bottle. The hospital issued each party an identification bracelet indicative of parenthood.

"71. [The defendant] remained overnight at a hotel near the hospital and asked [the plaintiff] to speak with her regarding any medical decisions necessary for the child.

"72. [The defendant] told [the plaintiff's sister] that she would support the child and would change her work hours to help raise the child.

"75. [The defendant] visited the baby two more times at the [hospital]. There were discussions between the parties about finances ([the defendant] gave [the plaintiff] $800) and about [the plaintiff's] discomfort with [the defendant's] having introduced [her friend] into the visits. [The friend], formerly a good friend of [the plaintiff], had become [the defendant's] new partner.

"76. [The defendant] sent pictures of herself and the child out on the Internet on July 26, 2000 to friends accompanied by the message: 'I hope you all enjoy the pics of my wonderful, beautiful boy. . . .'

"78. While the child was in the hospital, the parties had a number of discussions about their plans for parenting the child. They discussed the possibility of [the defendant] watching the child half-days or obtaining a new job that would allow her to spend more time with the child.

"79. [The defendant] continued until as late as August, 2000 to reiterate her wish to support the child.

"80. On October 27, 2000, the parties met outside [the plaintiff's] office and argued for approximately [one and one-half] hours about child support. [The plaintiff] at the time was working full time and parenting the child who,

as a result of his premature birth and the resulting medical problems, was treating with three different specialists.

"81. In the argument, [the defendant] offered to take the child if he were such a burden to [the plaintiff]. [The plaintiff] responded that she was not asking to be relieved of the child but only wanted financial assistance.

"82. [The defendant] acknowledged that she was not paying child support because she was angry at [the plaintiff] about the arguments they were having.

"83. [The plaintiff] testified that she received a letter (the original of which has been lost). The copy of the letter (offered over objection and taken *de bene*) is undated and unsigned, and, although it bears a postmark which indicates that it was mailed on October 31, it shows no legible year. The letter is addressed to [the plaintiff's first name] and it refers to [the child's first name]. It relates the reasoning of the writer who has decided not to have any further relationship with [the child] 'for the well-being of my son.'

"84. The Court finds that the letter was written by [the defendant] in late October, 2000. In the letter, [the defendant] expresses her intention to have no further interaction with the child. It asserts that [the defendant's] motivation is to protect [the child] by her withdrawal from his life. She asserts her love for the boy. She ends by requesting that [the plaintiff] stop contacting her at all."