Agnes, Peter W., J.
1.Introduction
This is a civil action based on a claim of breach of contract and, alternatively, a claim for unjust enrichment, in which the plaintiff, Steven J. Tankanow (plaintiff), maintains that in exchange for boxing management and promotion services he provided to the defendant, Jose Rivera (defendant), the defendant failed to compensate him. The defendant has filed a motion to dismiss.
2.Standard governing motion under Mass.R.Civ.P. 12(b)(6)
Under Massachusetts law and pleading practice, a complaint is sufficient and will withstand a motion to dismiss under Mass.R.Civ.P. 12(b)(6) “unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Nader v. Citron, 372 Mass. 96, 98 (1977) (quotation omitted). See also Kirkland Construction Co. v. James, 39 Mass.App.Ct. 559-60 (1995) (citations omitted) (“The lenient standard by which a complaint is measured on a motion to dismiss for failure to state a claim is familiar. The allegations are taken as true, doubts are resolved in favor of the complainant, and the motion must be denied unless it is certain that no set of provable facts could entitle the plaintiff to relief’). “In evaluating a rule 12(b)(6) motion, we take into consideration ‘the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.” Schaer v. Brandeis University, 432 Mass. 474, 477 (2000). While the plaintiffs factual allegations are accepted as true, the court will not consider legal conclusions cast in the form of factual allegations. Id. Moreover, although every reasonable inference favorable to the plaintiff will be accepted, the rule does not permit the plaintiff to rest on “subjective characterizations or conclusory descriptions of a general scenario which could be dominated by unpleaded facts.” Id. at 477-78 (quotations omitted).
3.Factual background
In a verified complaint, the plaintiff alleges that while working as a volunteer at the Worcester Boys and Girls Club beginning in the early nineties, he provided financial assistance to the boxing team. It was during this period that the plaintiff met the defendant who aspired to be a boxer. The defendant approached the plaintiff in 1993 and asked him (the *597 plaintiff) to manage his “newly developing professional boxing career." Later that year, according to the plaintiff, he was hired by the defendant to manage his career. Initially, the parties had an oral agreement whereby the plaintiff would receive 1 /3 of all “purse amounts” received by the defendant in exchange for serving as the defendant’s manager and promoter which included paying for the costs of training and comer support during fights, arranging professional fights and negotiating purse associated with the same, promoting the defendant, all with the goal of enabling the defendant to participate in a world championship fight. The defendant’s obligation, according to the plaintiff was to train and fight to the best of his ability. According to the plaintiff the agreement was supposed to be for as long as the defendant was a professional boxer.
4.
The plaintiff also alleges that he advanced money to the defendant on a regular basis from 1993 until 2005 even during periods when the defendant was not fighting and not earning any purses. The plaintiff also claims that he paid the costs of some of the defendant’s training even though that cost was to be deducted from the purses, and that he paid some of the defendant’s child support obligations. The plaintiff alleges he gave the defendant an interest free, 10-year loan for $20,000 and a loan to the defendant’s sister in the amount of $5,000.
5.
The plaintiff further alleges that on January 15, 2003, he and the defendant entered into a 2-year written contract for managerial services as a result of which the plaintiff was to receive 50% of all proceeds resulting from any services he performed under the contract. Upon the expiration of this agreement, the plaintiff maintains that the defendant again requested that the plaintiff serve as his manager for as long as he continues to fight. However, plaintiff reports that the defendant terminated his services as his manager on August 21, 2005.
6.
In the alternative, the plaintiff alleges that even if his contract claims are not successful, he is entitled to damages under a theory of unjust enrichment. The plaintiff claims, in total, he expended funds in excess of $300,000 to advance the interests of the defendant.
7. Discussion
(A)Statute of limitations
The defendant challenges the plaintiffs contract claims on several grounds. With regard to the statute of limitations issue, an action for breach of contract must be brought within six years after the cause of action accrues. G.L.c. 260, §2. “A cause of action for breach of contract accrues at the time of the breach . . . even though a specific amount of damages is unascertainable at the time of the breach or even if damages may not be sustained until a later time.” International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 29 Mass.App.Ct. 215, 221 (1990) (citations omitted). Here, the complaint was filed on April 13, 2006. There is no allegation that the breach of contract was not discovered in a timely manner. Indeed, the Verified Complaint suggests that the breach of contract claim occurred sometime in the 1990s and that there were a series of breaches up to 2005. The plaintiff does not allege that he was induced to delay making his claim because of misrepresentations by the defendant. Accordingly, on a breach of contract theoiy, the plaintiff is precluded from recovering any damages as a result of any action or inaction by the defendant that occurred prior to April 13, 2000. The same rule applies with regard to the claim for recovery on a quantum meruit or unjust enrichment theory. See Rousseau v. Diemer, 24 F.Sup.2d 137142 (D.Mass. 1998); Barber v. Fox, 36 Mass.App.Ct. 525-29 (1994).
(B) Effect of 523 CMR §3.04(1) on Plaintiffs Contract Claim.
Chapter 523 of the Code of Massachusetts Regulations, adopted on December 27, 1996, provides in Section 3.04(1), in part, that “[a]ll contracts between boxers and managers shall be in writing, in triplicate, on forms provided by the Commission. Such contracts shall not exceed three years in duration, and the manager’s share of the boxer’s earnings shall not exceed 1/3 of each of the boxer’s purses. A copy of such contracts shall be filed with the Commission within 48 hours of being signed.” This court is required to take judicial notice of this regulation. See G.L.c. 30A, §6.
The plaintiff argues that §3.04(1) does not apply to a private cause of action for breach of contract by a manager against a boxer, and, if it is found to apply, it is unlawful as infringing on the common-law freedom of contract.
(C) Statutoiy scheme regarding professional boxing in Massachusetts
The Massachusetts legislature has adopted a number of detailed provisions which control all aspects of boxing in Massachusetts. The General Court has established a State Boxing Commission, see G.L.c. 22, §12, and authorized it to adopt rules and regulations. See G.L.c. 147, §46. The Legislature has required a license for both professional and amateur boxing events throughout the state. For example, no one is permitted to participate in a boxing or sparring match or exhibition “for a prize or a purse” unless it has been licensed by the state boxing commission. G.L.c. 147, §§32, 33 & 34. A “professional boxer” is defined as “one who competes for a money prize or teaches or pursues or exists in the practice of boxing as a means of obtaining a livelihood or pecuniary gain.” G.L.c. 147, §35. Even so-called amateur boxing contests must be licensed. G.L.c. 147, §32. In addition, the Legislature *598 has provided that except in amateur contests, no one shall act as a physician, referee, timekeeper, professional boxer, manager, trainer or second to a boxer unless licensed by the Boxing Commission. G.L.c. 147, §35. The law also provides that at every boxing or sparring match or exhibition there shall be a licensed referee in attendance “who shall direct and control the same.” G.L.c. 147, §36. The statute further provides that,
[t]here shall also be in attendance two duly licensed judges, and each of said judges and the referee shall, at the termination of every such match or exhibition, vote for the contestant in whose favor the decision should, in his opinion, be rendered, or for a draw if, in his opinion, neither contestant is entitled to a decision in his favor, and the decision shall be rendered in favor of the contestant receiving a majority of said votes or if neither receives a majority as aforesaid a decision of a draw shall be rendered. Upon the rendering of said decision, the vote of each judge and the referee shall be announced from the ring. The referee shall have full power to stop the match or exhibition whenever he deems it advisable because of the physical condition of the contestants or one of them, or when one of the contestants is clearly outclassed by his opponent, or for other sufficient reason. The referee shall declare forfeited any prize, remuneration or purse or any part thereof belonging to the contestants or one of them if, in the judgment of a majority of the judges and the referee, such contestant or contestants are not or were not competing in good faith. The fees of the referee and other licensed officials shall be fixed by said commission, and shall be paid by the licensed organization prior to the match or exhibition.
G.L.c. 147, §36. In addition to detailed rules relating to the integrity of the event, the legislature also has expressed the need to protect the safety of boxers in the ring.
At any boxing or sparring match or exhibition there shall be in attendance a duly licensed physician, whose duty it shall be to observe the physical condition of the boxers and advise the referee or judges with regard thereto. Any competent physician who has had not less than three years’ experience as a medical practitioner may be licensed. No boxer shall be permitted to enter the ring unless, not more than three hours before, a physician licensed under the provisions of sections thirty-two to forty-seven, inclusive, shall certify in writing that the boxer is physically fit to engage in the proposed contest. The physician’s fee, as fixed by the commission, shall be paid by the licensee conducting the match or exhibition.
G.L.c. 147, §37. The health of the boxers is also reflected in the provisions adopted by the legislature regarding the length and frequency of the contest, and the equipment that must be used by the boxers.
Boxing or sparring matches or exhibitions shall not exceed ten rounds in length, but if such matches or exhibitions are to determine championships, they may, in the discretion of the commission, exceed ten rounds in length but not fifteen. No round in any such match or exhibition shall exceed three minutes. No contestant in a professional match or exhibition shall participate in more than ten such rounds, or more than the number of rounds determined by the commission as aforesaid, as the case may be, during any period of seventy-two hours. No contestant in amateur boxing shall compete in more than two tournaments in any period of seven days, nor participate in more than three contests between twelve o’clock noon of any day and twelve thirty o’clock in the morning of the next day. All amateur boxing or sparring matches or exhibitions held on any day shall terminate at or before twelve thirty o’clock in the morning of the next day. The contestants in professional matches or exhibitions shall wear, during the contest, gloves weighing at least eight ounces each and in amateur matches or exhibitions, unless otherwise authorized by the commission, the contestants shall wear, during the contest, gloves weighing at least eight ounces each. Every boxer participating in a boxing or sparring match or exhibition shall be required to wear a standard protective device, to be approved by the commission.
G.L.c. 147, §38. The age of the contestants as well as the spectators is also a matter that is regulated by statute. See G.L.c. 147, §39. The Superior Court is authorized to enjoin unlicensed or illegal matches. G.L.c. 147, §45. And, there are criminal penalties for those who promote or participate in unlawful boxing or sparring matches. See G.L.c. 265, §12.
(D) Complementary regulatory framework established by the Massachusetts Boxing Commission
In addition to the statutory framework, the State Boxing Commission had adopted a comprehensive regulatory framework to protect the safety of participants and to insure the integrity of the sport. For example, the Commission has declared that “[t]he purpose of 523 CMR 3.00 is to implement the mandate given to the State Boxing Commission in M.G.L.c. 147, 46 to establish rules governing the noble sport of boxing, protecting the physical safety of the contestants, and the interests of the viewing public . . .” The Boxing Commission has adopted a comprehensive licensing system in 523 C.M.R. 3:02. In 523 C.M.R. §3:03, the Boxing Commission has adopted standards for physical fitness of fighters and provisions for appropriate medical testing. Finally, in 523 C.M.R. §3:04, the Boxing Commission has adopted specific *599 requirements relating to contracts involving boxers and managers.
(1) Boxers and Managers. All contracts between boxers and managers shall be in writing, in triplicate, on forms provided by the Commission. Such contracts shall not exceed three years in duration and the manager’s share of the boxer’s earnings shall not exceed 1/3 of each of the boxer’s purses. A copy of such contracts shall be filed with the Commission within 48 hours of being signed. Associations shall not announce or advertise the names of boxers until a copy of the signed contract has been filed with the Commission for approval. If a boxer attempts to secure more compensation for his services than set forth in such a contract during its duration, that boxer shall be liable for suspension for at least three months.
(2) Associations and Managers. All contracts between associations and boxing managers shall specify the contest date, the contestants’ names and weights, and the cash compensation. Contracts shall be made in quadruplet on forms supplied by the Commission. One copy must be filed with the Commission, and one copy must be retained by the association, manager and contestants.
8. The puipose of the Massachusetts statutes and regulations
In order to assess the plaintiffs arguments that 523 C.M.R. 3:04 is not binding on the parties in this case and that alternatively notwithstanding the regulation his claim for quantum meruit should be recognized as valid, it is useful to consider the context in which the Massachusetts statutes and regulations were adopted and developments at the national level. The state Boxing Commission has had plenary authority over the licensing of boxing matches since the 1920s. See 5 Opinions of the Attorney General 1920, p. 716. The first comprehensive federal legislation on the subject was adopted in 1996. Under the Professional Boxing Safety Act of 1996, Pub. L. No. 104-272, 110 Stat. 3309, codified at 15 U.S.C. §6301-13, minimum health and safety standards were established, and limited oversight by the Justice Department and the Federal Trade Commission was authorized. See D. Moore, “Down for the Count: Is McCain’s Bill the One to Lift Boxing Off the Canvas,” 4 Va. Sports & Ent. L. J. 198, 212-14 (2005) (“Down for the Count”). This legislation was amended in 2000 with the adoption of the Muhammad Ali Boxing Reform Act of 2000, Pub. L. No. 160-210 §3, 114 Stat. 321, 322 (2000), codified at 15 U.S.C. §6301 et seq. In adopting this amendment, Congress made specific findings about the sport of professional boxing including that unlike other sports it operates without a centralized industry organization to establish uniform and appropriate business practices and ethical standards . . . [which] has led to ... disreputable and coercive business practices in the boxing industry." Down for the Count, supra at 215, quoting Pub. L. 106-210 §2. Congress called on the state officials to closely regulate boxing events, the welfare of boxers, and to “serve the public interest by closely supervising boxing activity in their jurisdiction.” Id. Congress also noted that “(c)urrently, state boxing commissions do not receive adequate information to determine whether boxers competing in their jurisdiction are being subject to contract terms and business practices which may violate State regulations, or are onerous and confiscatory.” Down for the Count, supra at 216. One of the specific features of the Muhammad Ali Act was to forbid long-term contracts between boxers and promoters that are considered coercive. Muhammad Ali Act, Pub. L. 106-210, §10. In addition, in the case of fighters boxing ten rounds or more, the Muhammad Ali Act makes it unlawful for promoters “to have a direct or indirect financial interest in the management of boxing; or a manager to have a direct or indirect financial interest in the promotion of a boxer.” Muhammad Ali Act, 15 U.S.C. §6308. A further amendment to the Muhammad Ali Act has been championed by Senator John McCain and has passed the Senate. See Down for the Count, supra at 220-25. There are a number of additional amendments to the federal law that have been proposed. On March 24, 2004, these additional amendments were adopted by the United States Senate, but have not yet received approval by the House of Representatives. See The Professional Boxing Act Amendments Act of2004, discussed in Down for the Count, supra at 220-23. One of the proposed amendments to federal law contained in Senator McCain’s bill requires managers and promoters to submit a copy of their respective contracts with the boxer to the federal administration established to provide oversight of boxing as well as to the local boxing commission with jurisdiction over the fight. See Down for the Count, supra at 222.
9.
However, commentators who have studied the history of corruption and exploitation in the sport of boxing have noted a need for even more sweeping reforms including limits on the fees that managers may collect from boxers, a prohibition against managers from making loans to boxers or offering them anything to induce them to enter into contractual relations, a limit on the percentage of a boxer’s earnings that a manager may collect as a fee, and a requirement that boxer-manager contracts be in writing. See Down for the Count, supra, at 231, 235, and 236. Another commentator has observed, *600 Michael J. Jurek, “Janitor or Savior: The Role of Congress in Professional Boxing Reform,” 67 Ohio St.L.J. 1187 (2006). One of the persistent criticisms of previous efforts to reform boxing is that reforms have been not been enforced. Id. at 1208. There are a variety of reasons offered for the problems that plague boxing, including the lack of a central governing authority, but “[m]any of the opportunities for manipulation result from an unequal balance of power, in which promoters and sanctioning bodies can force boxers to accept their contractual terms and fees.” Scott Baglio, “The Muhammad All Boxing Reform Act: The First Jab at Establishing Credibility in Professional Boxing,” 68 Fordam L.Rev. 2257, 2268 (2000). Given the history of problems in the sport of boxing, it is not at all surprising that the Massachusetts legislature would adopt strong measures and an effective mechanism for enforcement of legislative standards through the mechanism of a robust state boxing commission. See Hudson v. Craft, 33 Cal.2d 654, 659, 204 P.2d 1, 4 (1949).
*599 It has all of the ingredients of an Oscar-winning movie or a best selling novel — passion, glory, manipulation, scandal, corruption, a fall from greatness, and a desperate fight for survival. This stoiyline is not the vision of a screenwriter or novelist, but rather the nightmarish reality of the current state of professional boxing.
*600 10. The plaintiffs contractual claims
Apart from the statute of limitations problem discussed above, the plaintiffs contractual claims must fail because they are in direct conflict with 523 C.M.R. §3:04. The pre-2003 contract or contracts and the post-2005 contract or contracts were reportedly oral agreements that were of indefinite duration and the written contract covering the period 2003-2005 calls for the plaintiff manager to receive “50% of all proceeds resulting from any services” provided under the agreement.[1] As the defendant correctly points out, “(a]lthough courts do not go out of their way to discover some illegal element in a contract or to impose hardship upon the parties beyond that which is necessary to uphold the policy of the law, it is a principle universally accepted that the public interest in freedom of contract is sometimes outweighed by public policy, and in such cases the contract will not be enforced.” Beacon Hill Civic Association v. Restorante Toscano, Inc., 422 Mass. 318, 320-21 (1948) (quotation and citation omitted), quoted in Defendant’s Brief at 4-5. This same result was reached in Castillo v. Barrera, 146 Cal.App.4th 1317, 53 Cal.Rptr3d 494 (2007), where a manager was denied recovery on a contract claim because he lacked a written agreement as required by California law. Accord, De La Hoya v. Top Rank, Inc., 2001 WL 34624886, *9 (C.D. Cal. 2001).
11. The plaintiffs claim for unjust enrichment
The plaintiff argues in the alternative that even if his contractual claims fail, he should be allowed to recover damages because he performed services for the defendant and advanced funds to the defendant and members of his family in connection with his role as the defendant’s manager. However, to allow the plaintiff recovery under this theory would be inconsistent with the important public policy considerations that lie behind 523 C.M.R. §3:04. “The fact that a contract is unenforceable as against public policy generally forecloses all remedies, regardless of the label, unless a party can show that it was not equally at fault. See Capazzoli v. Holzwasser, 397 Mass. 158, 160 (1986) (contract in consideration of plaintiffs abandonment of her marriage held unenforceable ‘on a contract, quantum meruit, or any other theory’). See also T.F. v. B.L., 442 Mass. 522, 530 n.8 (2004) (party to unenforceable contract to create child could not recover child support on alternative theory of promissory estoppel); Lowell v. Massachusetts Bonding & Ins. Co., 313 Mass. 257, 272 (1943) (no recovery in quantum meruit where contract illegal for failure to comply with statutory requisites).” As the California Court of Appeals observed in Castillo v. Barrera, supra, “(The sound rationale for denying recovery on an oral contract to manage a professional boxer is to deter managers working without a written contract or license from engaging in illegal activily . . . Knowing they will receive no help from the courts in recovering for their illegal activities, managers are less likely to enter into illegal arrangements.” Id.. 146 Cal.App.4th at 1329, 53 Cal.Rptr. at 503 (quotation and citations omitted).[2]
ORDER
For the above reasons, the defendant’s motion to dismiss is ALLOWED.

In addition, the defendant asserts that he paid the plaintiff what was due under the written contract covering the period 2003-05. This assertion does not appear to be challenged by the plaintiff. See Affidavit of plaintiff Steven J. Tankanow dated August 28, 2006.

Although the plaintiff divides his claim into recovery of damages for services rendered to the defendant in the form of boxing management and promotion and recovery for other funds allegedly loaned or advanced to the defendant and his family, the plaintiff acknowledges that all his damages arise out of or are related to his business relationship with the defendant. A fair reading of the complaint also suggests that at all relevant times the plaintiff was acting in a managerial capacity in an effort to promote the defendant’s boxing career and, therefore, to advance his own financial interests. There is, therefore, no basis upon which to differentiate between contract damages and other damages.